[No. B198888. Second Dist., Div. Three. Apr. 30, 2009.]

DEWANDRA JOHNSON, Plaintiff and Appellant, v.
UNITED CEREBRAL PALSY/SPASTIC CHILDREN'S FOUNDATION OF
LOS ANGELES AND VENTURA COUNTIES et al., Defendants and
Respondents.

744

### COUNSEL

Schonbrun DeSimone Sephlow Harris & Hoffman, V. James DeSimone; Law Office of Twila S. White and Twila S. White for Plaintiff and Appellant.

Knee, Ross & Silverman, Howard M. Knee and Melanie C. Ross for Defendants and Respondents.

### OPINION

**CROSKEY, Acting P. J.**—This is an appeal from a summary judgment granted to an employer after one of its former employees filed suit alleging the employer fired her because she was pregnant. Plaintiff alleges violations of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), specifically sections 12940 (setting out specific types of unlawful conduct by employers, labor organizations, employment agencies and others), and 12945 (relating to pregnancy leave and other accommodations).[1]

To support its summary judgment motion, the employer presented evidence to the trial court that it terminated plaintiff for a valid reason—it had obtained information that plaintiff falsified her worktime records. Plaintiff opposed the motion by presenting evidence that (1) she had not falsified her time records, (2) she was fired soon after she disclosed she was pregnant, and (3) defendant had fired other women after they disclosed they were pregnant. The latter assertion was based on declarations from the other women.[2]

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

[2] The parties characterize such declarations as "me too" evidence.

Defendant made evidentiary objections to these declarations, and the declarations were addressed by both parties at the hearing on the motion for summary judgment. However, the reporter's transcript shows that the trial court made no evidentiary rulings at the hearing, and the trial court's minute order for the summary judgment motion, dated January 16, 2007, does not contain explicit evidentiary rulings. Instead, the minute order shows that plaintiff's evidence of these other firings of pregnant women was implicitly accepted by the trial court, but found to be insufficient to justify denying defendant's motion for summary judgment.

Defendant served a notice of ruling that does not contain any reference to its evidentiary objections. Later, however, defendant submitted an attorney order on the summary judgment motion, which the court signed and filed on March 5, 2007, nearly two months after hearing that motion. Despite the fact that the minute order indicates otherwise, the attorney order states that the court sustained defendant's objections to the declarations. The court signed the attorney order despite plaintiff's filed objection in which, among other things, she argued that the court had never made an express ruling on defendant's evidentiary objections. The admissibility of these declarations of defendant's former employees, along with the question as to whether triable issues of material fact were disclosed by the evidence submitted by the parties, constitute the appellate issues before us in this matter.

We conclude that the contested declarations are admissible and they constitute substantial circumstantial evidence which is sufficient to raise triable issues of material fact as to the reason for plaintiff's termination. We further conclude that other evidence in the record is also sufficient to raise triable issues regarding plaintiff's termination. Therefore, the summary judgment must be reversed and the matter remanded for further proceedings.

## BACKGROUND OF THE CASE

### 1. *Allegations in the Operative Complaint*

Dewandra Johnson is the plaintiff in this case. The defendant is the United Cerebral Palsy/Spastic Children's Foundation of Los Angeles and Ventura Counties (which also does business as United Cerebral Palsy, Inc., hereinafter, defendant). Two individuals were also named as defendants in plaintiff's operative (second amended) complaint. However, plaintiff ultimately dismissed many of the 12 causes of action in that complaint, and the individual defendants were not named in the remaining causes of action. Therefore, those individuals are not respondents in this appeal. They are, however,

important nonparties in the case. They are Raquel Jimenez, plaintiff's supervisor and a program manager at the defendant foundation, and Linda Jones, defendant's director of client living services and Jimenez's supervisor.

The causes of action that remain in the operative complaint (hereinafter, complaint) allege violations of the California Fair Employment and Housing Act and violations of public policy. Specifically, plaintiff asserted causes of action for discrimination based on sex (pregnancy) and discrimination based on disability (pregnancy) in violation of section 12940 and in violation of public policy; violation of California's law on pregnancy disability leaves (§ 12945); failure to take reasonable steps to prevent discrimination and retaliation (§ 12940); and wrongful termination in violation of public policy.

The complaint alleges all of the following. Defendant is a national charity which assists people with disabilities, including disabilities other than cerebral palsy. Plaintiff began her employment with defendant in November 2004 and was assigned to the position of caregiver. In May 2005 she was promoted to the position of counselor. She was in her mid-20's at the time. On or about July 31, 2005, plaintiff contacted Raquel Jimenez (Jimenez) and related that she was ill and needed to seek medical attention related to her pregnancy. On August 1, 2005, plaintiff's doctor diagnosed her with conditions that rendered her disabled by her pregnancy. Plaintiff alleges that this entitled her to protection under section 12945, including the right to take a pregnancy disability leave and the right to return to her position at the end of the leave. Plaintiff phoned Jimenez that same day and left a message stating that her doctor had prescribed bed rest and instructed her not to return to work until August 8, 2005. Jimenez sent plaintiff a certified letter indicating that plaintiff would need a doctor's note stating she was to be out until August 8, 2005, and a doctor's note releasing plaintiff to come back to work.[3,4]

---

[3] The letter sent by Jimenez is dated August 2, 2005. In her position as defendant's employee, plaintiff was apparently known by the name "Renee," and Jimenez's letter to plaintiff addresses plaintiff as "Dear Renee." The addressee name on the mailing envelope is "Dewandra Renee Johnson." The letter states: "I have received your voicemails, stating you are out for medical reasons. I will need a note from your doctor stating you are out until August 8th, 2005. Since this leave is longer than 3 days, our agency policy states you will also need a note from your doctor releasing you to come back to work. [¶] I have sent a letter since you have not returned my page, and we do not have a current phone number on file for you. At your convenience please contact me at the office [phone number], so we can discuss this matter further."

[4] In support of its motion for summary judgment, defendant presented evidence that it has a pregnancy disability leave policy that permits employees who are unable to work due to a pregnancy to take an unpaid leave of absence of up to four months, and when the employee returns to work the employee will be reinstated in the same or substantially equivalent position. The policy is set out in the employee handbook and in November 2004 plaintiff acknowledged in writing that she received a copy of the handbook.

Plaintiff further alleges that on August 8, 2005, she called Jimenez and left a message stating that her doctor had cleared her to come back to work on August 9, 2005. Jimenez responded by phoning plaintiff and telling her to meet Jimenez at defendant's Santa Monica facility on August 9, 2005, at 1:00 p.m. At their meeting, Jimenez informed plaintiff she was being terminated from employment and should return various materials to defendant, such as a pager and keys, and patient folders that plaintiff had in her possession. Plaintiff was given her final paycheck and a letter of termination.

The complaint alleges on information and belief that plaintiff was terminated because she was pregnant, and because she was disabled by the pregnancy and took a leave relating to her pregnancy. The complaint further alleges that Linda Jones (Jones) participated in the termination after Jones was informed that plaintiff's pregnancy condition required medical leave, and it alleges on information and belief that Jones had a discriminatory animus against pregnant women and a pattern and practice of engaging in adverse treatment of them such that she would create a justification for their termination. Also alleged on information and belief is that Jimenez had a discriminatory animus against pregnant women and heterosexual women. The complaint alleges that Jimenez disclosed to plaintiff and other employees that she is a lesbian, she gave preferential treatment to gay and lesbian employees and specifically recruited gays and lesbians to fill positions within the defendant foundation, and she made derogatory remarks regarding pregnant women and heterosexual women.

### 2. Theory of Defendant's Summary Judgment Motion

The theory of defendant's summary judgment motion is that defendant conducted a good faith investigation into plaintiff's timesheets and billing records for a particular workday; it had reason to conduct the investigation because plaintiff was not at a client's residence when she said she would be there; from the investigation, defendant came to the conclusion that plaintiff, an hourly employee, falsified a timesheet and billing record in an attempt to collect wages she did not earn; and it was on that basis only that defendant discharged her. Regarding the evidence that plaintiff presented to show that she was fired based on discrimination, defendant argues such evidence is not sufficient to support a finding by a trier of fact that the real reason plaintiff was discharged was because of discriminatory animus against pregnant employees.

---

Plaintiff stated at her deposition taken in this case that she had not requested an actual pregnancy disability leave. Rather, she simply informed Jimenez that she would be seeing a doctor for pregnancy-related problems, and then informed Jimenez that her physician ordered her to bed rest for a week.

### 3. Evidence Presented by the Parties

#### a. Plaintiff's Employment Positions and Supervisors

Defendant is a charitable corporation that provides services to disabled adults. Plaintiff began working for defendant as a community trainer (caregiver) in November 2004. That required her to provide direct care to particular clients of defendant. In her position as a caregiver, plaintiff was initially supervised by Jimenez and Loraine Sandgren, who were both program managers. (Jimenez had been hired in Nov. 2004 for the position of program manager.) Sandgren left defendant's employ in January 2005 when she (Sandgren) became pregnant, and thereafter plaintiff was supervised solely by Jimenez.

In May 2005, plaintiff was promoted to the position of community living specialist (counselor) when Jimenez recommended the promotion and Jones approved it. Plaintiff's duties as a counselor included visiting the residences of defendant's clients, assisting with their case management, staffing coverage for clients, and assisting clients with budgeting, paying bills, and doctor's appointments. She was told she could change her schedule for assisting clients if something came up that required her attention with respect to a client's health, well-being or other living situation. She was given a pager because occasionally Jimenez or defendant's clients would want to contact her.

#### b. Disputed Versions of Plaintiff's Job Performance

Plaintiff stated in her declaration filed in support of her opposition to defendant's motion for summary judgment that supervisor Loraine Sandgren told plaintiff she was pleased with plaintiff's work, told her she wanted plaintiff to have a raise, and told her that one of defendant's clients that plaintiff cared for, as well as that client's mother, had commented they were happy with the care plaintiff was providing to the client. Plaintiff submitted a declaration from the client's mother to that effect, as well as declarations from people who had worked for defendant, and who stated that plaintiff was a good employee. Plaintiff testified at her deposition that in her weekly meetings with Jimenez, Jimenez never told her anything negative or critical about her job performance, and she stated in her declaration that she had not received any written indications that her job performance was not satisfactory. She stated that throughout her employment with defendant, Jones told

her she was doing a good job, as did plaintiff's coworkers, and that once Jones relayed a positive comment about plaintiff's work that was made by the client services coordinator at the Westside Regional Center. Plaintiff asserted that she returned pages as promptly as she could because the pagers that defendant gave her to use did not always function properly, and she asserted that Jimenez knew the pagers were problematic.

Defendant asserted that during the time plaintiff held the position of counselor, she had performance-related issues. Jimenez testified at her deposition that on approximately 12 occasions she found plaintiff's performance to be unsatisfactory. She stated that several of those occasions involved "paging incidents," two involved plaintiff not being able to find coverage for a client that needed 24-hour care, and one involved plaintiff not being able to obtain medical supplies for a client. Other issues concerned plaintiff not appearing at appointments or following a schedule plaintiff devised for herself, and plaintiff having difficulty scheduling staff. These things occurred during the 10 weeks after plaintiff was promoted from caregiver to counselor. However, although Jimenez testified at her deposition that she did address these things with plaintiff verbally, she did not follow up with any written warnings. Also, Jimenez acknowledged that although performance evaluations are written for employees who have significant performance issues, she never wrote one up for plaintiff.

> c. *The Question Where Plaintiff Worked on Thursday, July 28, 2005*

Plaintiff testified at her deposition that she was scheduled to work with one of defendant's clients (Steve) at his apartment residence on July 28, 2005, beginning at approximately 9:00 a.m., and scheduled to see another client, Mery, at 2:00 p.m. that same day. However, Mery called plaintiff at around 8:45 in the morning and told plaintiff that she would not be available to see plaintiff in the afternoon. Plaintiff switched Mery to the 9:00 a.m. slot because Mery had a priority situation in that her bills were in danger of being paid late if plaintiff could not see her that day. Plaintiff testified that she told Steve and one of his caregivers, Maya Davis, that she was going to switch his and Mery's schedules.

Jimenez stated in a declaration that she called Steve's residence at approximately 1:00 p.m., looking for plaintiff but plaintiff was not at Steve's home at that time. Jimenez stated that she and plaintiff spoke later that same day and plaintiff told her that she (plaintiff) intended to work with Steve at 4:00 p.m.

that day. Plaintiff denies ever speaking with Jimenez that day. However in any event, on or about July 31, 2005, plaintiff faxed billing records (also known as monthly service records) to defendant that stated she had worked at Steve's apartment on July 28, 2005, for 4.5 hours; and thereafter, on or about August 8, 2005, plaintiff faxed time records (timesheets) to defendant, and the records indicated plaintiff worked with Steve between 4:00 p.m. and 8:00 p.m. on July 28, 2005.

Nnenna Okezie is employed by defendant as an on-call caregiver. She stated at her deposition that she met Steve for the first time on July 28, 2005, which she said was a day she was called by a woman counselor who asked if she (Okezie) could care for Steve for the 5:00 p.m. to 11:00 p.m. shift because defendant did not have anyone to cover that shift. Okezie stated that the counselor told her that she (the counselor) would be there at Steve's apartment when Okezie arrived and would explain to Okezie what needed to be done for Steve. She stated the counselor was indeed there when she arrived, did show her what to do for Steve, and told her that another worker would come at 11:00 to care for Steve. Okezie stated in a declaration that she signed after her deposition was taken that when she arrived at Steve's home she relieved the worker who was scheduled to care for him until 5:00 p.m. and no one besides herself worked at his home that evening, and thus she did not see plaintiff at his home that day. She stated that the first time she ever saw plaintiff was when she met plaintiff at her (Okezie's) deposition taken in June 2006.

Plaintiff stated in her declaration that it was she who called Okezie to ask that Okezie cover the shift at Steve's home on July 28, 2005, from 5:00 p.m. to 11:00 p.m. Plaintiff stated she introduced herself as "Renee" in that telephone call to Okezie, and again when Okezie arrived at Steve's apartment on the afternoon of July 28, 2005. Plaintiff stated that Jones and Jimenez and other persons on defendant's staff have referred to her as Renee, defendant has sent her correspondence addressed to her as Renee Johnson, and that to the best of her knowledge, no one else named Renee worked for defendant.

Plaintiff testified at her deposition that she (plaintiff) arrived at Steve's apartment at approximately 4:00 p.m. on July 28, 2005, and she stayed there about four hours. Caregiver Maya Davis was there when she arrived. When Okezie arrived about an hour later, plaintiff introduced herself as Renee and explained to Okezie what Okezie would need to do for Steve during her shift. Then plaintiff left Steve's home at 8:00 p.m.

When Okezie was questioned at her deposition about the counselor who called her to come and work at Steve's on July 28, 2005, Okezie stated the counselor was an African-American woman whom she had never seen before.

Asked if she had ever met an employee by the name of Renee, Okezie stated she had met a Renee, and Renee was Steve's counselor, the person she met on July 28 at his apartment. However, plaintiff was present at Okezie's deposition, and when plaintiff's attorney indicated to Okezie that plaintiff was one of the people at the deposition, Okezie looked at plaintiff and testified she had never met plaintiff before and had never seen plaintiff before. She stated the person she met with on July 28, 2005, at Steve's apartment who told her what needed to be done for Steve had a darker complexion than plaintiff.[5]

One of Steve's caregivers, Maya Davis, submitted a declaration in which she stated that on June 7, 2006, defendant's attorney, Howard Knee, questioned her about events on July 28, 2005. She told Knee that plaintiff did come to Steve's apartment late in the afternoon on July 28, 2005, and plaintiff was still there when Davis left the apartment after her shift was over (at 5:00 p.m.). Davis stated in her declaration that Jimenez was present at this questioning session with Knee, and Jimenez said to Davis "That's not what you told me over the phone," and Davis replied to Jimenez that she (Davis) had "not talked to you about this at all." Davis stated in her declaration that she worked on July 28, 2005, from 9:00 a.m. to 5:00 p.m. caring for Steve. Plaintiff came by at 4:00 p.m. and Okezie arrived there after plaintiff did, and when Davis left at 5:00 p.m., both plaintiff and Okezie were still at Steve's apartment. To meet Davis's declaration, defendant argues that since Okezie stated she worked her shift by herself, then at most, Davis's declaration shows only that plaintiff was at Steve's from 4:00 p.m. to 5:00 p.m. when Okezie arrived to work the shift by herself.[6]

---

[5] There is a dispute about when Okezie was first questioned by Jimenez about her July 28, 2005 work at Steve's. At her deposition, Okezie stated that it was in early August, "a little after the service records were due," that Jimenez first questioned her about her work on July 28, 2005, at Steve's home. Okezie testified that Jimenez asked her (1) if she worked that day for Steve, (2) if someone came in for Steve after her (Okezie's) shift was over, and (3) if she worked alone that day. She told Jimenez that she did work on July 28 at Steve's home and she worked alone that day. She described her conversation with Jimenez as "short." That testimony came after she had been asked earlier at her deposition whether she remembered the date on which she met Steve for the first time. She answered that she met him for the first time on July 28. Asked if there was a reason that date stands out in her memory, she stated: "Yes, because it was called to my attention that another employee said that she worked that day, the old hours that I worked." Asked when it was called to her attention, Okezie stated: "Most likely either late August or early September, because I was out of school and that was when Raquel [Jimenez] contacted me."

[6] Plaintiff disputes that Okezie worked until 11:00 p.m. on the night of July 28, 2005, and she bases this dispute on a portion of the deposition testimony of Danette Knight, who is the person who began caring for Steve at 11:00 p.m. on the night of July 28, 2005. Knight testified she did not recall seeing or talking to a coordinator, caregiver or counselor that day. She stated she walked in the door at Steve's apartment building at 11:00 that day and while going to Steve's apartment she did not see anyone coming from his apartment nor could she recall seeing anyone in that vicinity. However, when asked whether Steve let her into his apartment that day, she stated he did not; and when asked whether she remembered whether anyone let

Debbie Miller is defendant's coordinator (onsite supervisor) at the apartment building where Steve lives, and one of her duties was to make the rounds of the building to check on defendant's clients that live there. She also assisted with clients who needed assistance and did not have staffing, and she was responsible for insuring that the grounds of the apartment building were secure and no unwanted people were there. Defendant had clients in 12 units in the building. Miller testified at her deposition that she spoke with Jimenez on one occasion about plaintiff, and the conversation took place between July and August. Jimenez asked her if she saw plaintiff on "the 28th." Miller told Jimenez she did not remember seeing plaintiff (but she did see Okezie). Miller testified that on July 28, 2005, she was making rounds at the apartment building where Steve lived and on one of her rounds she went into Steve's apartment. Asked if she saw anyone there, Miller said she saw Okezie, and this was after 6:00 p.m. In a declaration Miller submitted, she stated that on July 28, 2005, she went to Steve's apartment around 4:00 p.m. and returned later in the evening to his apartment. She did not see plaintiff there.

### d. Defendant Fires Plaintiff

On Sunday, July 31, 2005, plaintiff left a voice mail message for Jimenez saying she was ill and would not be at work on Monday. Plaintiff asserts that message included information that plaintiff needed medical attention relating to her pregnancy. Jimenez denies that plaintiff told her in that message, or anytime before she was fired, that she was pregnant. However, for purposes of the summary judgment motion, defendant accepts, as undisputed, plaintiff's representation that she mentioned the pregnancy in the July 31, 2005 voice mail.[7] On Monday, August 1, 2005, plaintiff left another voice mail message for Jimenez, stating plaintiff's doctor put her on bed rest for a week. Then on August 8, 2005, plaintiff left a voice mail message for Jimenez stating she was cleared to return to work and asking whether she should meet with Jimenez or resume a schedule of meeting with clients. Jimenez responded by leaving plaintiff a voice mail message telling her to meet with Jimenez on August 9, 2005, at 1:00 p.m.

---

her into Steve's apartment that day, Knight stated she did not remember. Knight stated she had never met an employee by the name of Nnenna and did not remember ever talking to an employee by that name, never met anyone at Steve's apartment by that name, and never heard the name Okezie or met anyone with that name. Also at her deposition, Knight stated that she had never before seen the person who was previously sitting in the chair that Knight was sitting in. However, there is no indication in the portion of the deposition transcript that is in the appellate record that such person was Nnenna Okezie. Defendant asserts that Knight's testimony is not material because "mere minutes may have passed between the time Okezie left the apartment and when Knight arrived."

[7] As noted *post*, in a motion for summary judgment, we view the evidence in the light most favorable to the party opposing the motion.

When plaintiff and Jimenez met on August 9, 2005, Jimenez fired plaintiff. Asked at her deposition what it was that Jimenez said to her when she was fired, plaintiff responded that Jimenez said that "based on what has happened," Jimenez did not feel that plaintiff was capable of handling the job. Plaintiff testified that Jimenez did not explain what she meant by the phrase "based on what has happened." Plaintiff stated the other things that Jimenez said to her at that time were to turn in some documents, to sign a document to receive unemployment benefits, and that she (Jimenez) did not need to see plaintiff's medical release from plaintiff's doctor. Thus, not mentioned specifically by Jimenez at their meeting were plaintiff's billing and time records, plaintiff's pregnancy, nor the week of sick leave that plaintiff had taken.[8]

Asked at her deposition what it was that caused defendant to make the decision to terminate plaintiff, Jimenez stated it was her (Jimenez) having confirmed with Steve, and with Okezie and Debbie Miller, that plaintiff had not been at Steve's home working on the evening of July 28, 2005. In her declaration, Jimenez stated she and Jones talked about the situation, she (Jimenez) suggested that plaintiff be terminated, and Jones agreed and instructed Jimenez to fire plaintiff.

## DISCUSSION

### 1. Standard of Review

We review orders granting motions for summary judgment on a de novo basis. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 474 [261 Cal.Rptr. 735].) In doing so, we apply the same rules the trial court was required to apply in deciding the motion.

When the defendant is the moving party, it has the burden of demonstrating as a matter of law, with respect to each of the plaintiff's causes of action, that one or more elements of the cause of action cannot be established, or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) If a defendant's presentation in its moving papers will support a finding in its favor on one or more elements of the cause of action or on a defense, the burden shifts to the plaintiff to present evidence showing that contrary to the defendant's presentation, a triable issue of material fact actually exists as to those elements or the defense. (§ 437c,

---

[8] Plaintiff did not ask Jimenez why she was being fired. That fact could be used to prove more than one thing. Defendant might assert it shows that plaintiff knew she had falsified time records. Plaintiff could assert she did not falsify time records, and she only refrained from asking why she was fired because she believed it was due to her being pregnant and having taken time off from work because of the pregnancy.

subd. (p)(2).) That is, the plaintiff must present evidence that has the effect of disputing the evidence proffered by the defendant on some material fact. (*Aguilar, supra*, 25 Cal.4th at p. 849.) Thus, section 437c, subdivision (c), states that summary judgment is properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Because a summary judgment denies the adversary party a trial, it should be granted with caution. (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 865 [247 Cal.Rptr. 504].) Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party. The court focuses on issue finding; it does not resolve issues of fact. The court seeks to find contradictions in the evidence, or inferences reasonably deducible from the evidence, which raise a triable issue of material fact. (*Id.* at pp. 865–866.) If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court, or first addressed on appeal. (*Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698].) If, on the other hand, we find that one or more triable issues of material fact exist, we must reverse the summary judgment.

### 2. General Principles Applicable to Wrongful Discrimination Cases

■ Because it is often difficult to produce direct evidence of an employer's discriminatory intent when the employer takes a negative action against an employee or prospective employee, certain rules regarding the allocation of the burdens and order of presentation of proof have developed in order to achieve a fair determination of the question whether intentional discrimination motivated the employer's action. (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 252 et seq. [67 L.Ed.2d 207, 101 S.Ct. 1089]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).)

At trial, the plaintiff must present a prima facie case of discrimination: he or she was a member of a protected class; was qualified for the position he or she sought or was performing competently in the position he or she held; suffered an adverse employment action (for example, was denied employment, terminated, or demoted); and there is evidence that suggests the employer's motive for the adverse employment action was discriminatory. The burden on the plaintiff at that stage is not onerous, but it does require the plaintiff to present evidence of actions taken by the employer from which the trier of fact

can infer, if the actions are not explained by the employer, that it is more likely than not that the employer took the actions based on a prohibited discriminatory criterion. If the plaintiff establishes a prima facie case of discrimination, a rebuttable presumption of discrimination arises and the burden shifts to the employer to rebut the presumption with evidence that its action was taken for a legitimate, nondiscriminatory reason. If the employer carries that burden, the presumption of discrimination disappears, and the plaintiff's task is to offer evidence that the justification presented by the employer is a pretext for discrimination, or additional evidence of discriminatory motive. The burden of persuasion on the issue of discrimination remains with the plaintiff. (*Guz, supra,* 24 Cal.4th at pp. 354–356.)

■ In *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1003–1005 [67 Cal.Rptr.2d 483] (*Hersant*), the court stated that in employer-initiated summary judgment motions, an employer's presentation of evidence showing a nondiscriminatory reason for an adverse employment action, coupled with the employee's presentation of a prima facie case of discrimination, will not result in the need for a trial on the issue of discrimination. Rather, the employee must present evidence to rebut the employer's claim of nondiscriminatory motivation, or the employer will prevail on its motion. "[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Id.* at pp. 1004–1005.) The employee must do more than raise an issue whether the employer's action was unfair, unsound, wrong or mistaken, because the overriding issue is whether discriminatory animus motivated the employer. (*Id.* at p. 1005.) " '[T]he [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for . . . [the asserted] non-discriminatory reasons." [Citations.]' [Citations.]" (*Ibid.*) "In other words, plaintiff must produce substantial responsive evidence to show that [the employer's] ostensible motive was pretextual; that is, 'that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence.' " (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 [60 Cal.Rptr.3d 359] (*King*).)[9]

---

[9] In *Guz, supra,* 24 Cal.4th 317, 360, where an employer moved for summary judgment, the court stated that it was not determining whether the plaintiff had an initial burden of presenting a prima facie case of discrimination, only that once the employer presented a nondiscriminatory basis for taking an adverse employment action against the plaintiff, the plaintiff would

### 3. Defendant Met Its Evidentiary Burden, and Plaintiff Presented a Prima Facie Case of Discrimination

To support its motion for summary judgment, defendant was required to present evidence of a nondiscriminatory reason for taking the adverse employment action of firing plaintiff, who was a member of a protected class (pregnant employees). Defendant presented evidence that although plaintiff claimed in her time/billing records to have worked at Steve's home for four or four and one-half hours in the afternoon/evening portion of July 28, 2005, the caregiver who worked the 5:00 p.m. to 11:00 p.m. shift at Steve's home on that day told Jimenez that plaintiff was not at Steve's during that shift. Thus, the nondiscriminatory reason given by defendant for firing plaintiff was that plaintiff had falsified time records. On its face, it is sufficient to support a summary judgment in favor of defendant.

Plaintiff, in turn, presented evidence of a prima facie case that she was fired for an impermissible reason: she was a member of a protected class, she was performing her job competently, she suffered an adverse employment action, and evidence suggests a discriminatory motive for the adverse employment action because Jones indicated at her deposition that a pregnant employee poses safety concerns to herself and her clients. However, because defendant presented a legitimate reason for firing plaintiff, plaintiff also had to present "substantial evidence" that defendant's stated nondiscriminatory reason for firing her is untrue or pretextual, or that defendant fired her with a discriminatory animus. (*Hersant, supra*, 57 Cal.App.4th at pp. 1004–1005.)

### 4. Evidence upon Which Plaintiff Relies to Meet Her Substantial Evidence Burden

Plaintiff questions whether Jimenez did a thorough (good faith) investigation before firing plaintiff, since Jimenez questioned Okezie but did not question plaintiff herself, nor did Jimenez question Maya Davis who was working at Steve's until Okezie arrived there. However, *without more*, that comes under the rule that to defeat a summary judgment motion, a plaintiff must do more than raise an issue whether the employer's action was unsound, unfair, wrong or mistaken. Further, we note that although Jimenez did not question plaintiff or Maya Davis about plaintiff's whereabouts on the afternoon/evening of July 28, 2005, Jimenez did question Debbie Miller about whether she saw plaintiff at Steve's apartment building on July 28 and Miller said she did not recall seeing her. Additionally, Jimenez stated in her declaration that she checked the logbook that is maintained at Steve's apartment and found no entry from plaintiff for July 28, 2005. While

have to "show there was nonetheless a triable issue that decisions leading to Guz's termination were actually made on the prohibited basis of his age."

evidence shows that entries in the logbook were not required, defendant could argue it was not unreasonable for Jimenez to note the absence of an entry by plaintiff as one piece of evidence that plaintiff did not work at Steve's home on the day in question.

■ Plaintiff also questions whether Okezie's representations to defendant about plaintiff not being at Steve's home were correct given that plaintiff goes by the name Renee and Okezie *testified* that a woman named "Renee" was at Steve's apartment when Okezie arrived there and Renee explained to her how to care for Steve. Plaintiff also asserts there are contradictions in the evidence that Okezie and Miller gave *in their declarations and depositions*. However, all of these evidentiary matters came into being after the fact; they are not things that occurred prior to the decision to fire plaintiff. Thus, *by themselves*, they do not negate the evidence presented by defendant that it had a good faith reason for firing plaintiff (i.e., a reasonable belief that plaintiff had falsified time records), *at the time it fired her*. (*King, supra*, 152 Cal.App.4th at p. 433.) "It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case." (*Id.* at p. 436.)

Nor does plaintiff necessarily meet her summary judgment burden of presenting substantial evidence of pretext, lack of good faith, or discriminatory animus when she argues that she was fired very shortly after (1) she revealed to Jimenez that she was pregnant, and (2) she was away from work due to her pregnancy. In *King, supra*, 152 Cal.App.4th 426, the court held that the timing of an adverse employment action is not, by itself, sufficient to raise an inference that an employer took such action for an unlawful purpose. The employee in *King* was fired less than two months after returning from a four-month medical leave of absence. The employer presented evidence that the ground for firing the employee was that he violated the company's "integrity policy." (*Id.* at p. 436.) The *King* court stated: "[A] disabled employee has no greater prerogative to compromise his integrity than any other employee. The mere fact that UPS found plaintiff had breached its integrity policy shortly after returning to work is insufficient to raise an inference that his blood disorder prompted his discharge." (*Ibid.*)[10]

Nor are we persuaded by plaintiff's argument that not telling her she was being fired because of her time records constitutes substantial evidence of pretext, a lack of good faith, or discriminatory animus on the part of

[10] Federal courts in the Ninth Circuit are inclined to give the timing of adverse employment actions more weight. In *Stegall v. Citadel Broadcasting Co.* (9th Cir. 2003) 350 F.3d 1061, 1069, the court observed that the amount of time between an employee's protected activity and an adverse employment action imposed on the employee "can provide strong evidence of retaliation" by an employer. There, the employee was fired nine days after she complained of

defendant such that one can reasonably infer that it was plaintiff's pregnancy that caused her to be fired. Indeed, our Supreme Court has held that one cannot reasonably draw an inference of intentional discrimination solely from evidence that an employer lied about its reasons for taking an adverse employment action. "The pertinent statutes do not prohibit lying, they prohibit discrimination." (*Guz, supra*, 24 Cal.4th at p. 361.) While a circumstantial case of discrimination may be " 'considerably assist[ed]' " by proof that the employer's stated reasons are not worthy of belief "because it suggests the employer had cause to hide its true reasons," "[s]till, there must be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of the employer's actions." (*Ibid.*, italics omitted.) Thus, it follows that if "merely" lying about the reasons for an adverse employment action will not *by itself* support an inference of intentional discrimination, neither will a failure to give an employee any explanation at all for firing her. And neither will Jimenez's cryptically telling plaintiff, when she fired her, that "based on what has happened" Jimenez did not feel that plaintiff was capable of handling the job. That ambiguous message does not speak specifically to the alleged false time records, the alleged performance-related issues, or pregnancy. At best, it is not inconsistent with plaintiff's pregnancy condition, and it hints that perhaps Jimenez did not want to state the real reason why plaintiff was being fired.[11]

■ Although we have set out several matters which *by themselves* will not constitute substantial evidence that defendant's stated reason for firing plaintiff was pretextual or that defendant acted with a discriminatory animus when it fired her, there remains the question whether these matters, *when taken together*, do constitute sufficient evidence to demonstrate a triable issue of fact with respect to plaintiff's contention that her pregnancy was the true cause of defendant's decision to fire her. In our view, they do. Plaintiff was fired the very day she returned from a short sick leave related to her pregnancy. Jimenez did not give plaintiff a specific reason why she was being fired, and Jones admitted she had concerns about having pregnant employees care for defendant's clients. Jimenez never asked plaintiff about the hours she

---

discrimination. The court in *Passantino v. Johnson & Johnson Consumer Products* (9th Cir. 2000) 212 F.3d 493, 507, stated that "evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant."

"Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz, supra*, 24 Cal.4th at p. 354.)

[11] Plaintiff also relies on *King, supra*, 152 Cal.App.4th 426, and *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 [69 Cal.Rptr.2d 900, 948 P.2d 412], for their instruction on another type of cause of action—breach of implied employment contract to terminate only for good cause. Plaintiff asserts that to have an honest belief in its reason for firing plaintiff, defendant should have conducted an investigation in which neutral personnel investigated the facts and plaintiff was given an opportunity to explain what happened. However, plaintiff is not suing defendant for breach of an implied contract.

claimed on her timesheets, and there is no indication that plaintiff's time records were previously a cause for concern. Plaintiff goes by the name Renee, and Okezie testified that a woman named Renee was at Steve's home when she arrived there and Renee showed her how to care for Steve. Moreover, there is evidence that plaintiff was never told her job performance was unsatisfactory in any manner. In *Siegel v. Alpha Wire Corp.* (3d Cir. 1990) 894 F.2d 50, 55, the court observed that "inconsistencies in performance evaluations prior and subsequent to an employee's termination may support an inference of pretext." Here, plaintiff presented evidence that she was promoted to the position of counselor, was not given negative performance evaluations prior to her firing, and her coworkers and clients found her to be competent, whereas Jimenez testified that after she was promoted to the position of counselor, the quality of her work declined.

5. *Declarations from Other Employees Also Constitute Substantial Evidence That Requires Reversal of the Summary Judgment*

The challenged "me too" declarations that plaintiff included in her opposition to defendant's motion for summary judgment constitute substantial evidence requiring reversal of the judgment. Former employees of defendant stated in their declarations that (1) they too were fired by defendant after they became pregnant, (2) they know of someone who was fired by defendant because she was pregnant, (3) they resigned because Jimenez made their work stressful after they notified her they were trying to become pregnant, or (4) they know of occasions when employees who were dishonest or cited for dishonesty, were not fired by defendant. These employees worked at the same facility where plaintiff worked, they were supervised by the same people who supervised plaintiff (Jimenez and Sandgren), and their supervisors were, in turn, supervised by Jones. This is substantial evidence sufficient to raise a triable issue of material fact as to why defendant fired plaintiff.[12]

---

[12] The record contains evidence of comments made by Jimenez about pregnancy. When told that one of defendant's employees was trying to become pregnant, Jimenez is reported to have remarked that the employee should have a drink instead. The comment was made in approximately July 2005. Jimenez is also reported to have asked: "Why would you want to become pregnant?" The comments are not per se evidence of a discriminatory animus based on pregnancy, if only because the context of the comments is not known.

Defendant asserts these remarks by Jimenez are reasonably seen as "stray remarks" that carry little or no weight on the issue whether the firing of plaintiff was the result of discriminatory animus on the part of defendant. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809–810 [85 Cal.Rptr.2d 459].) We disagree. They are comments that are in the mix of evidence to be presented by plaintiff to the trier of fact, and the trier of fact will determine their importance. The same is true of evidence relating to what some employees perceived as a gay and lesbian subculture of employees at defendant's facility: comments made by Jimenez (who is open about being a lesbian), about heterosexuality and being a lesbian; Jimenez telling her lesbian and gay friends to interview for positions there; and gays and lesbians receiving favorable treatment from defendant.

As discussed below, courts have routinely sanctioned use of this "me too" type of evidence. Nevertheless, relying on *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511 [76 Cal.Rptr.2d 547] *(Beyda)*, and other cases, defendant filed written objections to those portions of the declarations that deal with the topic of pregnancy.

In *Beyda, supra,* 65 Cal.App.4th 511, 518, the plaintiff claimed workplace sexual harassment and sought to introduce evidence that some of the defendant's other employees had also been sexually harassed. The *Beyda* court upheld the exclusion of the evidence, saying: "When offered on the theory that respondents are likely to have committed the conduct at issue [in *Beyda*] simply because they did the same thing before, the evidence goes to propensity, and is inadmissible under Evidence Code section 1101, subdivision (a)."[13] (65 Cal.App.4th at p. 518.) The *Beyda* court stated that rather than lacking probative value, the evidence was actually too relevant and had too much probative value. *(Ibid.)* However, *Beyda* did not address whether the evidence could be admitted under the provisions of subdivision (b) of Evidence Code section 1101. As discussed below, many courts have held that evidence of the type sought to be introduced by the plaintiff in *Beyda*, and by the plaintiff in the instant case, is admissible under rule 404(b) of the Federal Rules of Evidence (28 U.S.C.) to show intent or motive, for the purpose of casting doubt on an employer's stated reason for an adverse employment action, and thereby creating a triable issue of material fact as to whether the stated reason was merely a pretext and the actual reason was wrongful under employment law.

---

[13] Evidence Code section 1101 provides in relevant part: "(a) Except as provided in this section . . . , evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Rule 404 of the Federal Rules of Evidence (28 U.S.C.) contains similar provisions. It states in relevant part: "(a) Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: [¶] . . . [¶] (3) . . . Evidence of the character of a witness [including character for truthfulness], as provided in Rules 607, 608, and 609.

"(b) . . . Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

#### a.  *The Declarations*

Melissa Wyatt stated in a declaration that she worked for defendant as a counselor from March 2004 to March 2005, and she was present at a meeting in January 2005 when Jimenez and Jones discussed another employee, Diana Olivas, who was pregnant. Jimenez and Jones told Wyatt they wanted to fire Olivas because she was pregnant and they were worried about being liable in case she was injured, but they could not do that because it was illegal. So Jimenez and Jones discussed reasons they could use to fire her. Noting that Olivas had nicked defendant's client Steve while shaving him, Jimenez and Jones discussed terminating Olivas based on Olivas being too rough with Steve. Ultimately, Jimenez did tell Olivas that she was being fired because she was too rough with Steve, and Wyatt was present when Olivas was fired.

In a second declaration, Melissa Wyatt stated Diana Olivas was fired within a few weeks of when she inquired about maternity leave, and Jones was "extremely worried about Diana's safety and Diana hurting herself on the job." Wyatt also stated that when Jones and the person who formerly held Jimenez's position as program manager, Loraine Sandgren, learned that another employee, Denise Wooten, was pregnant, they "created accusations about Denise in order to terminate her," and Sandgren fired Wooten.

Diana Olivas stated in her declaration that she was six months pregnant when she inquired about maternity leave in March 2005 and was fired by Jimenez. She was told she was being fired because she was rough with Steve in that she nicked him once when she shaved him.

Denise Wooten stated in a declaration that she began working for defendant in February 2004 and learned she was pregnant in November 2004. She told one of defendant's counselors she was pregnant and the counselor told Jones and Sandgren, and a week or two later (in Dec. 2004), Jones called her on the phone and left a message saying that she was being fired.

Wendy Nash stated in her declaration that she learned in late October 2004 she was pregnant. She told a client of defendant that she was caring for at the time about the pregnancy. That client, in turn, told Loraine Sandgren that Nash was pregnant. Within two days of telling the client that she was pregnant, Nash was fired by Sandgren. Sandgren told her she was being fired because she was pregnant.[14]

---

[14] All four of the employees who state they were fired when they became pregnant (plaintiff, Diana Olivas, Denise Wooten and Wendy Nash) worked at defendant's Santa Monica facility, and that facility had the same three supervisors during the period of the firings (2004 & 2005). The supervisors were Jones, Sandgren, and Jimenez. Those matters, coupled with the very short period of time between when three of these four employees state their supervisors learned

Sandra Baeza stated in a declaration that she worked for defendant from August 2003 to July 2005. Jimenez became less friendly to her after she told Jimenez she was trying to become pregnant. She resigned from her position with defendant because Jimenez made it a very stressful place to work. That included Jimenez accusing Baeza of lying on her timecard. Baeza told Jimenez she had been told to account for all time worked for a client even if she was not with the client. Regarding other instances of alleged dishonesty at defendant's facility, Baeza stated that one employee was cited for a timecard discrepancy but was not fired. Another employee was hired even though defendant knew the employee had a conviction for welfare fraud, and this employee was eventually fired, but it was only after several months had passed since Baeza told Sandgren that the employee had been fired from a group home for stealing cologne and food. Thus, there is evidence that defendant had tolerated, at least to a certain extent, dishonesty.

Despite its assertion that "me too" evidence is not admissible, defendant itself presented evidence regarding employee pregnancy and pregnancy leaves. Jimenez stated in a declaration that when Danette Knight, one of Steve's caregivers, requested a pregnancy leave in the summer of 2005, Jimenez instructed plaintiff to prepare for Knight's absence by finding alternative care for Steve. Knight stated in a declaration that she became pregnant in early 2005, had her baby in October 2005, worked for defendant during her pregnancy and also took a pregnancy leave of absence, and returned to work beginning January 2006. Knight stated she told plaintiff she was pregnant. Plaintiff presented a different set of facts. She stated in her declaration that Danette Knight did not tell her she was pregnant, and plaintiff did not learn Knight was pregnant until after plaintiff was fired. Rather, it was a vacation request for Knight that prompted plaintiff and Jimenez to talk about finding a replacement for Knight, and during plaintiff's employment she was not told that Knight had requested pregnancy leave.

Kern Tam stated in a declaration that she is defendant's director of human resources, defendant has over 500 employees, and a majority of them are women. "Often, [defendant's] employees become pregnant and work through their pregnancies and afterward." Tam stated defendant often receives requests for pregnancy leaves and routinely grants such leaves. Defendant's employee handbook contains a pregnancy disability policy permitting pregnant employees to take a leave of absence of up to four months. However, Maya Davis stated in a declaration that she began working for defendant in December 2004, and prior to Danette Knight taking a pregnancy leave, Davis did not know of any of defendant's employees who had been granted such a leave.

---

they were pregnant and when they were fired, could reasonably be used by a trier of fact as evidence that knowledge of the pregnancies caused the supervisors to fire the employees.

b. *Case Law Governing the Declarations*

In *Obrey v. Johnson* (9th Cir. 2005) 400 F.3d 691, the plaintiff alleged his employer engaged in a pattern or practice of racial discrimination in promotions to senior management positions. The court found relevant, and admissible, pattern or practice evidence in the form of (1) a statistical report showing a correlation between race and promotion,[15] (2) testimony of one fellow worker who recalled conversations in which the employer's officials expressed discriminatory bias against persons of the plaintiff's race, saying they were not good enough to do the job, and (3) anecdotal evidence of three fellow employees who believed they had suffered race discrimination. (400 F.3d at pp. 694–699.) The *Obrey* court stated the latter evidence would require the jury to assess the credibility of the three fellow employees to determine the weight of their testimony (minitrials on the three employees' own claims of being discriminated against), but that did not constitute undue delay or a waste of time under rule 403 of the Federal Rules of Evidence (28 U.S.C.). (400 F.3d at pp. 698–699.)[16]

In *Estes v. Dick Smith Ford, Inc.* (8th Cir. 1988) 856 F.2d 1097 (*Estes*) (implicitly disapproved on other grounds in *Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 237, 242, 244–245 [104 L.Ed.2d 268, 109 S.Ct. 1775], which grounds were in turn overruled by the Civil Rights Act of 1991, § 107, 42 U.S.C. § 2000e-2(m); see *Pilditch v. Board of Educ. of City of Chicago* (7th Cir. 1993) 3 F.3d 1113, 1118, fn. 2; *Stender v. Lucky Stores, Inc.* (N.D.Cal. 1992) 780 F.Supp. 1302, 1305, fn. 9), the plaintiff sued for age and race discrimination after the defendant car dealer discharged him from his job. The reviewing court reversed a judgment against the plaintiff, finding the trial court erred in excluding the plaintiff's evidence that "tended to show a climate of race and age bias at Dick Smith Ford." (*Estes*, at p. 1102.) The *Estes* court stated that while it was true that the plaintiff had to prove that his own termination was unlawful, "[a]s a matter of common sense, however, it is hard to see how evidence which suggests that [the employer] discriminated

---

[15] The *Obrey* court stated that statistical evidence is helpful to show a pattern or practice of discrimination, but the court did not state statistical evidence is necessary to demonstrate pattern or practice, and it observed that even though the report sought to be used by the plaintiff in that case did not account for the relative qualifications of the applicant pool, that factor went to the weight/probative value of the evidence, not its admissibility. (*Obrey v. Johnson, supra,* 400 F.3d at pp. 694–696.)

[16] Rule 403 of the Federal Rules of Evidence (28 U.S.C.) is similar to Evidence Code section 352. Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

against blacks in hiring would be irrelevant to the question of whether it fired a black employee because of his race." (*Id.* at p. 1103.) The court held the same analysis applied to the plaintiff's evidence that the employer treated White customers better than Black customers, and that one of the employer's managers, whom the plaintiff asserted participated in the decision to fire the plaintiff, told racist jokes about Blacks and referred to Black customers and the plaintiff himself as " 'damn niggers.' " (*Id.* at p. 1104.)

The *Estes* court observed that a wholesale exclusion of such evidence "can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives." (*Estes, supra*, 856 F.2d at p. 1103.) The court then went on to quote from *Riordan v. Kempiners* (7th Cir. 1987) 831 F.2d 690, where that court observed that the law tries to protect employees from being treated more harshly than they would be treated " 'if they were a different race, sex, religion, or national origin, but it has difficulty achieving this goal because it is so easy to concoct a plausible reason for . . . firing . . . a worker who is not superlative. A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries.' " (*Estes, supra*, 856 F.2d at p. 1103.) The *Estes* court observed that such "[c]ircumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices—evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." (*Ibid.*) The court also stated that the defendant in *Estes* had "confuse[d] the sufficiency of evidence to establish a violation with its admissibility. Evidence of prior acts of discrimination is relevant to an employer's motive in discharging a plaintiff, even where this evidence is not extensive enough to establish discriminatory animus by itself." (*Id.* at p. 1104.) The court added that although the jury might not have accepted the plaintiff's version of events at work, "he should have been allowed to present this evidence at trial." (*Ibid.*)

The *Estes* court also noted that while exclusion of any one of the pieces of evidence rejected by the trial court might not have been sufficiently prejudicial to require a reversal of the judgment, cumulatively the exclusions "ma[d]e a significant difference to Estes's chances of persuading the jury. In effect, the District Court limited Estes to proving [his employer's] discriminatory intent solely from the facts of his own discharge. Here, as in most discrimination cases, the facts of the discharge were inconclusive. [The employer's] explanation that Estes was discharged for poor performance was facially plausible and difficult to refute. Although Estes could respond that

[the employer] had changed its initial explanation, and Estes had been an adequate employee, these facts did not, without some other evidence of discriminatory animus, present a tangible reason for disbelieving [the employer's] account of its motives. [¶] Estes's offer of proof concerning [the employer's] workplace and prior discriminatory acts could have provided this other evidence." (*Estes, supra*, 856 F.2d at p. 1105.)

*Estes* was cited with approval in *Heyne v. Caruso* (9th Cir. 1995) 69 F.3d 1475, 1480 (*Heyne*), where the plaintiff presented a prima facie case of quid pro quo sexual harassment by the owner of the restaurant where she worked, who fired her the day after she refused his sexual proposition, and the owner asserted a legitimate reason for the firing, to wit, that the plaintiff was late in opening up the restaurant on two consecutive mornings. The *Heyne* court held the trial court committed prejudicial error in excluding the testimonial evidence of other female employees at the restaurant who allegedly were sexually harassed by the owner. The court stated: "It is clear that an employer's conduct tending to demonstrate hostility towards a certain group is both relevant and admissible where the employer's general hostility towards that group is the true reason behind firing an employee who is a member of that group." (*Id.* at p. 1479.) The court cited a prior United States Supreme Court case that noted an employer's mental processes seldom can be presented by eyewitness accounts and therefore evidence that the employer has a discriminatory attitude in general is relevant and admissible to prove discrimination. (*Id.* at pp. 1479–1480.) The *Heyne* court observed that although the employer's alleged harassment of other female employees could not be used by the plaintiff to prove that the employer propositioned her on the night before she was fired, that is, could not be used to show his character in order to prove that he acted towards the plaintiff in conformity with that character, it was admissible to prove his motive or intent in discharging the plaintiff. (Fed. Rules Evid., rule 404, 28 U.S.C.; see fn. 13, *ante*.) If the plaintiff could show that the employer sexually harassed other female employees, such evidence would be relevant and probative of his general disrespect and sexual objectification of female employees, and such an attitude is relevant to the issue of his motive for firing the plaintiff. (69 F.3d at p. 1480.) The probative value of the evidence "is especially high 'because of the inherent difficulty of proving state of mind.' [Citation.]" (*Ibid.*)[17]

---

[17] In *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757], the court addressed evidence of uncharged acts admissible under Evidence Code section 1101, subdivision (b) (fn. 13, *ante*), to prove the actor's intent in committing a charged act. "Evidence of intent is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.]" (7 Cal.4th at p. 394, fn. 2, italics omitted.) " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally,

Other courts have used the same analysis to find that similar evidence was relevant and admissible. In *Shattuck v. Kinetic Concepts, Inc.* (5th Cir. 1995) 49 F.3d 1106, an age discrimination suit brought by a discharged employee, the court observed that even though the employee's failure to promote cause of action was time-barred, a vice-president's prior comment to the plaintiff that the plaintiff's age was the reason he was not being promoted was relevant to the issue of the employer's motivation for subsequently discharging the employee. (*Id.* at p. 1109.) Also relevant and admissible was evidence that (1) after the plaintiff was discharged, one of the defendant's executives stated the plaintiff's age was the reason for the discharge, and (2) other employees were discriminated against on the basis of their age. (*Ibid.*) Regarding the latter evidence, the court said: "There is no proscription of evidence of discrimination against other members of the plaintiff's protected class; to the contrary, such evidence may be highly probative, depending on the circumstances." (*Id.* at pp. 1109–1110, fn. omitted.) In *Spulak v. K Mart Corp.* (10th Cir. 1990) 894 F.2d 1150, disapproved on another point in *Hazen Paper Co. v. Biggins* (1993) 507 U.S. 604, 615–616 [123 L.Ed.2d 338, 113 S.Ct. 1701], the court stated that "[a]s a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." (*Spulak*, at p. 1156.) The court cited another court's "holding that [such] evidence [is] probative of the defendant's discriminatory intent and create[s] a fact question on the issue of pretext." (*Ibid.*) *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976 [16 Cal.Rptr.2d 787], disapproved on another point in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179], is a sexual harassment case in which the court held that testimony regarding the defendant's area vice-president's sexual harassment of other employees was admissible to show the defendant employer's knowledge of the misconduct. (*Bihun*, at pp. 987–988, 990–991.)

■ Recently the United States Supreme Court, in a case involving a claim of age discrimination in employment, took up the question of the admissibility of evidence from several former employees of the defendant who claimed that they too were discriminated against by the defendant because of their age. (*Sprint/United Management Co. v. Mendelsohn* (2008) 552 U.S. 379 [170 L.Ed.2d 1, 128 S.Ct. 1140] (*Sprint*).) Unlike the case before us, the former employees in *Sprint* had not worked in the same department, nor had they been supervised by the same people, as had the plaintiff. The *Sprint* court framed the issue on appeal as follows: "[W]hether, in an

at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Id.* at p. 402.) Subdivision (b) of section 1101 applies to the admission of evidence of crimes, *civil wrongs*, and other acts to prove, among other things, intent and motive.

employment discrimination action, the Federal Rules of Evidence require admission of testimony by nonparties alleging discrimination at the hands of persons who played no role in the adverse employment decision challenged by the plaintiff." (552 U.S. at p. 383 [170 L.Ed.2d at p. 6, 128 S.Ct. at p. 1144].) The Supreme Court's answer was that the relevance of the evidence "is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case," and that similar considerations are involved in balancing the probative value of the evidence against its prejudicial effect. (552 U.S. at p. 387 [170 L.Ed.2d at p. 9, 128 S.Ct. at p. 1147].) Thus, contrary to the analysis of the holding in *Sprint* that is proffered by defendant in the instant case, there was no wholesale rejection of such "me too" evidence by the Supreme Court, and *Sprint* does not support defendant's assertion that the "me too" evidence presented by plaintiff in this case should be rejected.

Further, whereas the *Sprint* court concluded that (1) the challenged evidence was neither per se admissible nor inadmissible and (2) the trial court should be given the opportunity to clarify the evidentiary ruling it made at trial because the basis of that ruling was not clear (*Sprint, supra*, 552 U.S. at pp. 382–388 [170 L.Ed.2d at pp. 6–9, 128 S.Ct. at pp. 1144–1147]), here we can say as a matter of law that the "me too" evidence presented by plaintiff in the instant case is per se admissible under both relevance and Evidence Code section 352 standards. The evidence sets out factual scenarios related by former employees of defendant that are sufficiently similar to the one presented by plaintiff concerning her own discharge by defendant, and the probative value of the evidence clearly outweighs any prejudice that would be suffered by defendant by its admission. Dissimilarities between the facts related in the other employees' declarations and the facts asserted by plaintiff with regard to her own case go to the weight of the evidence, not its admissibility.

## CONCLUSION

Defendant presented a legitimate reason for firing plaintiff. It asserted that plaintiff falsified time records. Plaintiff denied that she submitted false records and she presented a prima facie case that she was fired for an impermissible reason—her pregnancy. Because she also presented substantial evidence of pretext or discriminatory animus in her firing, she raised a triable issue of material fact regarding the true reason that she was fired. Therefore, the summary judgment must be reversed.

## DISPOSITION

The summary judgment from which plaintiff has appealed is reversed and the cause is remanded for further proceedings in conformance with the views expressed herein. Costs on appeal to plaintiff.

Kitching, J., and Aldrich, J., concurred.