Filed 1/28/14  Kelly v. Ports Management Corp. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HELEN KELLY, | B242004 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC458286) |
| v. | |
| PORTS AMERICA MANAGEMENT CORP. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dunn, Judge.  Reversed.

Mancini & Associates, Marcus A. Mancini, Timothy J. Gonzales; Benedon & Serlin, Wendy S. Albers and Gerald M. Serlin for Plaintiff and Appellant.

Epstein Becker & Green, Steven R. Blackburn, Matthew A. Goodin and Deanna L. Ballesteros for Defendant and Respondent Marine Terminals Corporation.

Helen Kelly filed suit against Ports America Management Corporation, Marine Terminals Corporation, James Hilbert, Eric Stordahl and Nic Cosso (collectively, respondents), asserting various employment discrimination related causes of action. The trial court granted respondents' summary judgment motion. Kelly appeals from the judgment entered in favor of Marine Terminals.[1] We conclude that Kelly raised a triable issue whether the articulated reason for her adverse employment action was pretextual and therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The Pacific Maritime Association (PMA) is a multi-employer association of shipping, stevedoring, and terminal companies that operates out of West Coast ports. Marine Terminals, a member of PMA, is a terminal operator and stevedoring company that operates out of various ports, including the Los Angeles/Long Beach Port (the Port).[2] The International Longshore and Warehouse Union (ILWU) is the exclusive bargaining representative for longshore workers, marine clerks, and foremen employed by PMA member companies at the Port. ILWU Local 63 is the local union representative for marine clerks at the Port.

Marine clerks are employed as either "out of hall" or "steady" workers. Out of hall marine clerks obtain work assignments through dispatch halls maintained and operated jointly by PMA and ILWU Local 63. Occasionally, terminal operators advertise a steady work assignment for which qualified out of hall marine clerks can apply. Steady workers work exclusively for one terminal

---

[1]    Appellant indicates that she abandons her appeal against Ports America Management Corporation, Hilbert, Stordahl, and Cosso.

[2]    Marine Terminals does business as Ports America.

operator in a particular work assignment and report to work at that location rather than at the dispatch hall.

Kelly became a marine clerk and joined ILWU Local 63 in 1999. She worked out of the hall until 2003, when she became a steady clerk for Marine Terminals. Kelly received a steady assignment as a day shift yard planner at a 30 percent pay rate under the collective bargaining agreement for marine clerks, which is the highest pay rate for clerks. She worked in this assignment until April 2009.

Respondents Stordahl and Hilbert were yard operations managers at the Seaside Transportation Services Terminal where Kelly worked. Stordahl and Hilbert supervised Kelly, and they in turn were supervised by respondent Cosso, the day shift terminal operations manager. Kelly was considered to be a good, competent worker.

On September 25, 2008, Kelly's physician placed her on disability leave due to back and shoulder injuries. Kelly provided written medical documentation of her leave to her union and verbally informed her union chief supervisor, Chuck Gilmore. As a union member, she was not required to notify Marine Terminals directly. Kelly stated that it was Gilmore's responsibility to inform Marine Terminals that she was out on disability, but, at the time of her deposition in this case, she did not know whether or not he had done so.

Hilbert and Stordahl stated in their depositions that they did not know the process Kelly needed to follow in notifying anyone of her medical leave. However, David Wear, a member of Marine Terminals' labor relations group, acknowledged that Kelly was expected to contact her union officials to take a medical leave and was not required to contact Marine Terminals prior to her leave.

He further acknowledged that there was no written policy that an employee in Kelly's position contact Marine Terminals before taking a medical leave.

Kelly did not notify Stordahl, Hilbert, or Cosso of her disability leave. Kelly's duties during her leave were covered by Anthony Tomich, the other marine clerk assigned to yard planning duties at the 30 percent rate of pay, and by 25 percent pay rate steady workers who occasionally were assigned to yard planning work at the 30 percent pay rate. Cosso, Hilbert, and Stordahl kept Kelly's steady assignment open for her in the hope that she would return because she was an experienced yard planner.

During Kelly's absence, Hilbert asked Tomich where Kelly was, and Tomich told him of a rumor that she was having surgery. Hilbert and Stordahl periodically asked Tomich to call Kelly to ask when she would be returning to work. Tomich called Kelly approximately once a month during her absence to ask when she would be returning to work. Each time Kelly replied that she had taken disability leave and planned to return as soon as possible.

According to Cosso, a day or two after Kelly had not shown up for work, Tomich told him that Kelly was out for medical reasons. Cosso tried to contact Kelly within the first month of her absence and left her a message. Two to three weeks later, in November or December 2008, Cosso called Kelly again and asked when she would be returning to work. She told him she would return in approximately one month. He asked her to keep him informed about her return date. Cosso called Kelly again in late December 2008 and again in January 2009 to ask when she would return to work. During the December 2008 conversation, Kelly told Cosso she would return in a month or two.

Hilbert also called Kelly during her disability leave. In January 2009, he asked when she was returning, and she told him it would be in a few months.

4

In late March 2009, Kelly called Gilmore to inform him that she would return to work on April 10 and that she would call him on April 9 to remind him of her return. Gilmore instructed Kelly to call Hilbert, which she did on April 9.

When Kelly called Hilbert on April 9, 2009, Hilbert stated, "Where have you been? You just can't come back here like this. We don't know whether you were on vacation or disability. Which one is it? You know, there's – where's the communication?" Stordahl, who was also on the phone, intervened, saying, "You can't talk to her like that. That's not true. Helen, we just don't know how to handle the situation. We have to talk to someone in human resources or something to figure out how to deal with this, and we'll call you back." Kelly asked them to call her back.

Later that day, Stordahl called Kelly to inform her that she was being let go and should check into the hall for a new assignment. Stordahl expressed regret and stated that he would consider her for future hirings.

In his deposition and declaration, Cosso stated that Kelly was terminated as part of a workforce reduction. In January 2009, Cosso was instructed by Marine Terminals' upper management to reduce labor costs due to a downturn in business in the last quarter of 2008. Cosso then released back to the dispatch hall all of the steady foremen and some steady crane operators at the Seaside Transportation Services Terminal. In addition, Cosso decided that the Seaside Transportation Services Terminal needed only one day shift steady yard planner assignment at the 30 percent rate of pay and two day shift steady vessel planner assignments at the 30 percent rate of pay.

Cosso decided to release back to the dispatch hall the most recently hired marine clerks. Cosso therefore decided to eliminate Kelly's steady yard planner assignment and a steady vessel planner assignment occupied by a clerk named

5

Tunde George-Tay. Marine Terminals had never previously used seniority as the criterion for laying off marine clerks during a workforce reduction.

On April 10, 2009, George-Tay was released to the dispatch hall. George-Tay subsequently was rehired by Marine Terminals at the 30 percent rate of pay.

After Kelly called Stordahl on April 9 to state that she intended to return to work, Stordahl asked Cosso what to do about her request. Cosso instructed Stordahl to tell Kelly to report to the dispatch hall based on his prior decision to eliminate her position.

Two other steady planner assignments at the 30 percent rate of pay were eliminated in May 2009. Tomich retired from the day shift steady yard planner assignment effective May 1, 2009, and his position was not filled. Instead, qualified 25 percent steady workers occasionally were assigned to yard planning work at a 30 percent rate of pay. In addition, Cosso decided to eliminate a steady rail planner assignment at a 30 percent rate of pay.

In late 2009 or early 2010, Kelly applied for a steady position with Marine Terminals at a 25 percent rate of pay, but she was told that "they didn't want [her]."

Kelly filed a complaint against Ports America Management Corp., Marine Terminals, Hilbert, Stordahl, Cosso, and various Does. She asserted four causes of action: (1) disability discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900, et seq.); (2) a violation of the California Family Rights Act (CFRA) (Gov. Code, § 12945.2); (3) retaliation and wrongful termination in violation of public policy; and (4) a violation of California Labor Code section 226.

Respondents moved for summary judgment and summary adjudication, arguing in part that Kelly was terminated because of a workforce reduction, not for

6

a discriminatory reason. The court granted summary judgment in favor of respondents on all causes of action. The court entered judgment in favor of respondents. Kelly filed a notice of appeal.

## DISCUSSION

Kelly contends that the trial court erred in granting summary judgment in favor of Marine Terminals on her FEHA disability discrimination claim, her CFRA disability discrimination claim, and her claim for wrongful termination in violation of public policy. We agree and therefore reverse.

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) "Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party." (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 754 (*Johnson*).) The moving party bears "the burden of demonstrating as a matter of law, with respect to each of the plaintiff's causes of action, that one or more elements of the cause of action cannot be established, or that there is a complete defense to the cause of action. [Citations.] If a defendant's presentation in its moving papers will support a finding in its favor on one or more elements of the cause of action or on a defense, the burden shifts to the plaintiff to present evidence showing that contrary to the defendant's presentation, a triable issue of material fact actually exists as to those elements or the defense." (*Id.* at p. 753.)

7

I.    *FEHA Disability Discrimination*

"FEHA prohibits employment discrimination based on a physical disability. (Gov. Code, § 12940, subd. (a).) . . . [¶]  In the context of disability discrimination, the plaintiff initially has the burden to establish a prima facie case of discrimination.  The plaintiff can meet this burden by presenting evidence that demonstrates, even circumstantially or by inference, that he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability.  [Citation.]  To establish a prima facie case, a plaintiff must show """"actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .'"""  [Citation.]'  [Citation.]  The prima facie burden is light; the evidence necessary to sustain the burden is minimal.  [Citation.]  . . .  [G]enerally an employee need only offer sufficient circumstantial evidence to give rise to a reasonable *inference* of discrimination.  [Citation.]"  (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310 (*Sandell*).)  If the plaintiff establishes his prima facie case, "a rebuttable presumption of discrimination arises and the burden shifts to the employer to rebut the presumption with evidence that its action was taken for a legitimate, nondiscriminatory reason."  (*Johnson*, *supra*, 173 Cal.App.4th at p. 755.)

"When the defendant moving for summary judgment produces substantial evidence of a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts to the plaintiff to prove intentional discrimination.  [Citation.]  The plaintiff must """offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or

8

evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.'" [Citation.]' . . .

"""[T]he plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" [Citation.] Circumstantial evidence of "'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate" on an improper basis. [Citations.] With direct evidence of pretext, "'a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.' [Citation.] The plaintiff is required to produce 'very little' direct evidence of the employer's discriminatory intent to move past summary judgment." [Citation.]' [Citation.] "'Direct evidence is that which, 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.' [Citations.]"' [Citation.]" (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834 (*Batarse*).)

On appeal, Marine Terminals concedes that Kelly had a disability, was on medical leave, and suffered an adverse employment action. However, Marine Terminals contends that Kelly has failed to demonstrate either that its proffered reason was pretextual, or that Marine Terminals acted with discriminatory animus in terminating her.[3] (*Sandell*, *supra*, 188 Cal.App.4th at p. 314; *Batarse*, *supra*, 209 Cal.App.4th at p. 834.)

---

[3] Although Marine Terminals states that Kelly cannot establish a prima facie case of discrimination, it does not set forth any argument on that point. Instead, the argument in its brief focuses on whether Kelly has presented sufficient evidence in response to Marine Terminals' proffer of a nondiscriminatory reason for her termination. We therefore deem

*Guz* explained that "[a]n employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process, does not mean it may 'use the occasion as a convenient opportunity to get rid of its [protected] workers.' [Citations.]  Invocation of a right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release.  Where these are issues, the employer's explanation must address them. [Citation.]" (*Guz, supra*, 24 Cal.4th at p. 358.)  Legitimate reasons for a reduction in force "are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*.  [Citations.]"  (*Ibid.*)

Marine Terminals proffered evidence that, in January 2009, Cosso was instructed by upper management to implement cost reductions in response to a downturn in business.  Cosso therefore released all the steady foremen and over ten steady crane operators back to their dispatch halls in January 2009.  In April 2009, Cosso eliminated George-Tay's steady vessel planner assignment and Kelly's steady yard planner assignment, and in May 2009, two other steady planner assignments were eliminated.

Marine Terminals' proffered reason – an instruction to downsize in response to a downturn in business – is facially unrelated to prohibited bias. (*Guz*, *supra*, 24

the argument forfeited and turn to whether Kelly has successfully established that the proffered reason is pretextual. (See *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 19, fn. 12 ["[I]ssues and arguments not addressed in the briefs on appeal are deemed forfeited."].)  Even if not forfeited, Kelly has established a prima facie case based on the undisputed evidence that she was terminated on the same day that she gave notice of her plan to return from her disability leave. (See *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388 ["A plaintiff can satisfy his or her initial burden under the test by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision."].)

10

Cal.4th at p. 358.) The burden thus shifted to Kelly to produce evidence that Marine Terminals' reason was a mere pretext for disability discrimination. (*Id.* at p. 360.)

Kelly contends that the temporal proximity of her termination to her disability leave, in conjunction with other circumstantial evidence, is sufficient to withstand summary judgment. We agree. Kelly presented the following evidence in opposition to the summary judgment motion.

First, Kelly cites the evidence that her supervisors knew that she was out on disability leave and intended to return to work as soon as she was able. She contends that Hilbert's comments to her in her April 2009 phone call, expressing "annoyance and feigned ignorance about [her] absence," were inconsistent with Cosso's testimony that the decision to terminate her position had already been made.

Second, Kelly cites a series of emails between Cosso and labor relations management as evidence that Cosso's decision to terminate her was not based on a downturn in business. In a March 25, 2009 email from Cosso to "Bob" in SoCal Labor Relations Management, Cosso stated that he had previously spoken with Bob regarding Kelly and further explained as follows: "We were advised by one of her fellow yard planners (a steady) in late October of '08 that she would be taking vacation time but gave no indication as to when she would be back. Upon hearing about this and the fact that she did not notify anyone in management I contacted her in November to inquire when she would be back and she advised that she was recovering from a personal surgical procedure and that she would be back after the first of the year (Jan. '09). [¶] Since that time she has not shown back to work nor made an attempt to contact us as to when she plans on coming back. What we have discovered is that she has been in contact with one of our steady

11

yard planners. In that conversation she advised she would be back to work this week but at this point she has not shown up nor has she made any more attempts to contact us or him. [¶] It is our intention to check Ms. Kelly back into the hall and per your advice will await her to contact us or show up at which time we will inform her that we are checking her back into the hall."

Cosso forwarded this email to Hilbert on April 9, 2009, telling Hilbert, "We should be able to simply check [Kelly] in. She went out on 'elective surgery,' not medical need surgery, she did not notify anyone in management of her intention to take off time nor did she make an attempt to contact us as to when she would be returning to work after several months. [¶] All lead to the fact that we have cause on a few different fronts to check her in. I would check in with LR and HR to ensure we are in the right but I cannot see how we could not be to simply call her back and tell her she's checked in."

Kelly also cites an April 2010 email exchange among Cosso, Stordahl, and Hilbert,[4] in which Hilbert sets forth "bullet points" summarizing the reasons for Kelly's termination: "Summer '08: [Kelly] disappears from work without telling management. [¶] About a week later, Anthony Tomich tells us she called him to say she was taking a medical leave. [¶] We followed up with a phone call to confirm, and she says she will be out for a while. We wish her well. [¶] We learn from Anthony that she expects to be back in November '08. [¶] She misses that return date, but we keep in touch with her and wish her well. [¶] Calls are made in January '09 with no response. [¶] In February/March, cost-saving measures are implemented and she is cut, along with the other 30% planner at the bottom of the list (Tunde George-Tay). [¶] The three of us conferenced with her to tell her the

---

[4] Kelly acknowledges that these emails were sent a year after her termination, but she argues that they are relevant to show that the management knew that she was out on disability leave and wanted to return.

12

news (she called us) and we offer to have her back as a 25/30% all categories. She does not accept."

In the email, Hilbert further emphasizes the following "key points": "We never knew for sure what her condition was, but whatever it was is irrelevant. We don't need to know. [¶] She did not go about securing an official medical leave with PMA, nor did she ever notify management that she was taking time off. [¶] She never asked for a doctor's slip or complained about back/neck issues. The only medical issue we ever had with her was when she requested an ergonomic mouse pad. . . . [¶] We did not create a hostile environment; in fact, we wished her speedy recovery several times. [Cosso] went through proper channels (HR/LR) before cutting her. [¶] We offered her an alternative to layoff (25/30% all categories)."

In reply, Stordahl wrote that it took "so long to check [Kelly] in" because he "considered her as a [*sic*] injured reserve player, basically a trained body that we could keep our options open when volume's picked up."

Finally, Kelly contends that she had an impeccable work record, there had been no complaints about her work performance, and Marine Terminals did not have a corporate policy of using seniority as the criterion for determining which marine clerks to lay off during a reduction in force. She contends that Cosso's testimony that he terminated employees by reverse seniority was a "convenient excuse" for him to terminate her.

We conclude that Kelly has raised a triable issue regarding whether Marine Terminals' proffered reason for her termination was pretextual. One way in which pretext may be demonstrated is by showing that "'the proffered reason did not actually motivate the discharge.'" (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224.) Construing the evidence in Kelly's favor, it casts doubt on

13

the veracity of the explanation that a reduction in force was the motivating factor in Kelly's termination. Instead, for several reasons, it raises the inference that management was aware of Kelly's leave and troubled by her absence, not that Kelly's position needed to be terminated because of a workforce reduction.

First, Kelly has submitted sufficient evidence to raise a triable issue regarding whether Marine Terminals' management knew she was out on disability leave, not on vacation. Hilbert acknowledged that Tomich told him that Kelly was out on medical leave, and that she intended to return to work afterward. Cosso also stated that, a day or two after Kelly did not show up for work, Tomich told him the reasons for Kelly's medical leave.

Second, when Kelly called Hilbert and Stordahl in April 2009 to tell them that she was returning to work, neither Hilbert nor Stordahl raised the issue of a workforce reduction. Instead, Hilbert stated that they did not know whether Kelly was on vacation or disability, demanded, "where's the communication," and told Kelly she "just can't come back here like this." Stordahl intervened, telling Hilbert, "You can't talk to her like that. That's not true." Stordahl told Kelly they did not know now to handle the situation and would call her back after speaking to someone in human resources. Thus, although the conversation indicates that they were troubled by her absence, there was no suggestion from either Hilbert or Stordahl that her position needed to be eliminated because of a workforce reduction.

Nor did Cosso mention a reduction in force as a reason for Kelly's termination in his March 25, 2009 email to Bob in SoCal Labor Relations Management, which set forth "the details" regarding their intention to check Kelly into the dispatch hall. Instead, he wrote that they learned from a different steady yard planner that Kelly was taking vacation time but she had not indicated when

14

she would return. Cosso also cited the fact that Kelly told him that she would return around January 2009, but she did not, and she did not contact anyone at Marine Terminals after January 2009. Cosso thus stated that, pursuant to Bob's advice, they would wait for her to "contact us or show up at which time we will inform her that we are checking her back into the hall." This email indicates that Kelly's absence, not a reduction in force, led to the decision to release her.

Similarly, Cosso's April 9, 2009 email to Hilbert cited the following reasons to check Kelly into the dispatch hall: she "went out on 'elective surgery,' not medical need surgery, she did not notify anyone in management of her intention to take off time nor did she make an attempt to contact us as to when she would be returning to work after several months." Cosso concluded that they "have cause on a few different fronts to check her in," but a workforce reduction was not one of those named. As in the March 25 email, there was no indication that Cosso had decided to eliminate Kelly's position as part of a workforce reduction. Instead, Cosso cited only issues relating to Kelly's absence as the reason for her termination.

In addition to the evidence that a workforce reduction was not previously cited as a reason for her dismissal, Kelly presented evidence that the management considered her to be a good employee and hoped that she would return to work because of her experience as a yard planner. She also presented evidence that Marine Terminals did not previously use seniority as the basis for workforce reductions.

Kelly thus has presented evidence that Marine Terminals' proffered reason for her termination was pretextual. "[O]ur Supreme Court has held that one cannot reasonably draw an inference of intentional discrimination solely from evidence that an employer lied about its reasons for taking an adverse employment action."

15

(*Johnson*, *supra*, 173 Cal.App.4th at p. 758.)  Nonetheless, the evidence that the employer lied, in conjunction with other circumstances, can constitute sufficient evidence to withstand an employer's summary judgment motion based on a proffered legitimate nondiscriminatory reason for an adverse employment action. (See *ibid*.)

Johnson, *supra*, is instructive.  There, the employer presented evidence that it fired the plaintiff for falsifying time records, and the trial court granted summary judgment in favor of the employer.  On appeal, the court found that the plaintiff had presented sufficient evidence to demonstrate a triable issue of fact with respect to her contention that her pregnancy, rather than the defendant's proffered explanation, was the true reason for her firing.  (*Johnson*, *supra*, 173 Cal.App.4th at p. 758.)  The court reasoned that the plaintiff "was fired the very day she returned from a short sick leave related to her pregnancy," her supervisor did not give her a specific reason for her firing, and the employer admitted concerns about having pregnant employees.  (*Ibid.*)  In addition, the court relied on evidence that the employer did not ask questions about her timesheets at the time of her firing and had never previously expressed concern about her timesheets.  (*Id.* at pp. 758-759.)  Finally, the court cited evidence that the plaintiff did not receive negative performance evaluations prior to her firing and was generally found to be competent.  (*Id.* at p. 759.)

Similar to *Johnson*, Kelly was terminated the very day she called to say she was going to return from her disability leave, and she had never previously received negative performance evaluations.  Also similar to *Johnson*, Marine Terminals did not raise the proffered, nondiscriminatory reason prior to her termination, and Kelly presented evidence that her absence, not a workforce

16

reduction, was the reason for her termination. Thus, a reasonable jury could infer that Kelly was discriminated against because of her disability leave.

Stordahl, Hilbert, and Cosso repeatedly expressed concern about what they perceived as Kelly's lack of communication regarding her leave, and it could be inferred that this concern led to Kelly's termination. However, Kelly presented evidence that they knew she was on leave and intended to return. Moreover, Wear acknowledged that Kelly was not required to contact Marine Terminals prior to her leave. Given that Kelly had no duty to communicate with Marine Terminals, her alleged failure to do so does not dissipate the inference that she was terminated because of her disability leave.

Kelly's evidence that Marine Terminals' proffered reason for her termination is "not worthy of belief," in conjunction with the other circumstances she raises, constitutes sufficient evidence to raise a triable issue of fact whether her disability leave was the true reason for her termination. (*Johnson*, *supra*, 173 Cal.App.4th at p. 758.) Summary judgment should not have been granted in favor of Marine Terminals on Kelly's FEHA claim.

II.    *CFRA Disability Discrimination*

Kelly contends that the trial court erred in summarily adjudicating her disability discrimination claim under CFRA. We agree.

"The CFRA, which is contained within the FEHA (§ 12900 et seq.), 'is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security.' [Citation.]" (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 878.) "A plaintiff can establish a prima facie case of retaliation in violation of the CFRA by showing the following: (1) the defendant was a covered employer; (2) the plaintiff

17

was eligible for CFRA leave; (3) the plaintiff exercised his or her right to take a qualifying leave; and (4) the plaintiff suffered an adverse employment action *because he or she exercised the right to take CFRA leave*.  [Citation.]"  (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 491.)

Marine Terminals contends that Kelly cannot establish a prima facie case of retaliation because the evidence showed that Cosso was not aware that she was on leave protected under the CFRA.  However, CFRA "requires only proof of a causal connection between the employee's protected status or conduct and the adverse employment action taken by the employer.  [Citations.]  The decision maker must have knowledge, but just knowledge of the protected conduct – the absences.  Knowledge that the conduct was protected is not required."  (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1258.)  The rule advocated by Marine Terminals "would encourage employers to have their managers remain ignorant of both the law and the facts relating to CFRA leave."  (*Id.* at p. 1259.)

Kelly relies on the evidence proffered regarding her FEHA claim to argue that she has raised a triable issue whether she was terminated because she exercised the right to take CFRA leave.  As discussed above, Kelly has presented evidence that her disability leave, not Marine Terminals' proffered reason of a workforce reduction, was the reason for her termination.  We therefore reverse the trial court's grant of summary judgment in favor of Marine Terminals on Kelly's CFRA leave.

III.    *Wrongful Termination in Violation of Public Policy*

We also conclude that Kelly's claim for wrongful termination in violation of public policy should not have been summarily adjudicated.  To establish a claim for wrongful termination in violation of public policy, Kelly must show that (1) she

was employed by Marine Terminals; (2) her employment was terminated; (3) the violation of public policy was a motivating reason for the termination; and (4) the termination caused her damages.  (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641.)  In light of our holding that Kelly presented sufficient evidence to raise a triable issue whether she was terminated because of her disability leave, we conclude that Kelly has raised a triable issue whether a violation of public policy was a motivating reason for her termination.

## DISPOSITION

The judgment is reversed.  Appellant is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

19