Filed 6/21/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| NATASHA MEEKS, | |
| Plaintiff and Appellant, | E061775 |
| v. | (Super.Ct.No. RIC10019124) |
| AUTOZONE, INC. et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Edward D. Webster (retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. IV, § 6 of the Cal. Const.) and Raquel A. Marquez, Judges. Affirmed in part, reversed in part with directions.

Rastegar & Matern, Matthew J. Matern and Sandra M. Falchetti for Plaintiff and Appellant.

Littler Mendelson, Gregg C. Sindici and Philip L. Ross for Defendant and Respondent Autozone, Inc.

1

Ogletree, Deakins, Nash, Smoak & Stewart and Lara C. De Leon for Defendant and Respondent Juan Fajardo.

## I.  INTRODUCTION

Plaintiff and appellant Natasha Meeks contends that she suffered sexual harassment on the job.  She brought suit against her employer, defendant and appellant AutoZone, Inc. (AutoZone), and the alleged harasser, defendant and appellant Juan Fajardo, pursuing claims of sexual harassment, failure to prevent sexual harassment, and retaliation in violation of the Fair Employment and Housing Act (FEHA), Government Code section 12940 et seq.  The trial court granted summary adjudication in favor of AutoZone on Meeks's retaliation claim.  A jury returned defense verdicts on her remaining claims.

On appeal, Meeks argues that certain evidentiary rulings at trial constitute prejudicial error, requiring reversal.  She also asserts that the trial court's grant of summary adjudication to AutoZone on her retaliation claim was erroneous.  We affirm the trial court's grant of summary adjudication on the retaliation claim.  We find, however, that several erroneous evidentiary rulings require reversal of the judgment and remand for new trial on the remaining claims.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

AutoZone hired Meeks as a customer sales representative in March 2006.  She received a number of promotions, eventually becoming a store manager.  When Meeks

testified at trial in May 2014, she continued to be employed by AutoZone in the role of store manager.

AutoZone hired Fajardo as a customer sales representative in 2005. He too received a number of promotions, eventually becoming a store manager.

Meeks and Fajardo were never assigned to the same store. But she first encountered him within the first few months of her employment, while working on an inventory crew. She continued to have regular contact with him during inventories, and when they would visit one another's store to pick up parts. She would also have contact with him by telephone on an almost daily basis in connection with "stock checks."

According to Meeks, Fajardo regularly subjected her to sexual harassment in various forms, both while she was a customer sales representative and after she was promoted into management. He would comment on her body and clothes, ask her to go out with him, or more directly suggest that they have sex. He would send her text messages with sexual content, including images and video. And on three occasions, he forcibly attempted to kiss her; he succeeded once in pressing his lips to hers, despite her efforts to push him away. He suggested that he could facilitate her advancement and promotion within AutoZone, through his position as one of the "favorites" of the district manager, Susana Ledesma. He also told Meeks that he would get her fired if she reported his conduct.

Meeks first reported Fajardo's conduct to AutoZone—specifically, to Ledesma, who was a supervisor of both Meeks and Fajardo—in October 2009. According to

3

Meeks, Ledesma told her that she would talk to Fajardo and get back to her. After Ledesma did so, she informed Meeks that Fajardo had "just kind of laughed it off and said, 'Oh, it was all a misunderstanding. It's a joke. It's no big deal." Meeks testified that Ledesma told her that she (Meeks) should "just squash it," because Ledesma did not want to "lose three managers" (referring to Meeks, her husband, who was also an AutoZone employee, and Fajardo). A few days later, Ledesma told Meeks that her husband had complained to his own manager, and expressed anger that she (Ledesma) "had an obligation to report it to HR" because "another store manager was involved." She instructed Meeks to tell the investigator from the human resources department that "everything had been taken care of." Meeks further testified that Ledesma threatened to fire Meeks and her husband if Meeks took her complaints "higher." Meeks was not contacted by the AutoZone human resources department, however, until August 2010, ten months later.

Fajardo was terminated by AutoZone in September 2010. According to AutoZone, he was terminated for violating company policy by admittedly sending a text message with sexual content to another AutoZone employee, Amanda Anguiano. Meeks contends Fajardo's conduct towards Anguiano "was inextricably intertwined with [his] harassing conduct toward Meeks," and that Fajardo's termination was a belated reaction to his conduct toward Meeks.

Meeks brought suit against AutoZone and Fajardo in September 2010. Her first amended complaint was filed in September 2013, after the trial court granted her leave to

4

amend.  The first amended complaint asserts four causes of action:  (1) sexual harassment-hostile work environment, against Fajardo and AutoZone; (2) failure to prevent sexual harassment and retaliation, against AutoZone only; (3) retaliation, against AutoZone only; and (4) sexual battery, against Fajardo and AutoZone.  The trial court granted summary adjudication in favor of AutoZone on the retaliation claim.  During trial, Meeks dismissed her sexual battery claim.[1]  After trial, the jury returned defense verdicts on the remaining claims, responding in the negative to the special verdict form question "Did Natasha Meeks prove by a preponderance of the evidence that she was subjected to unwanted harassing conduct because she is a woman?"  The trial court entered judgment in favor of Fajardo and AutoZone.

## III.  DISCUSSION

**A.  The Trial Court's Erroneous Evidentiary Rulings Require Reversal of the Judgment.**

Meeks challenges several of the trial court's rulings concerning the admission or exclusion of evidence.  For the reasons discussed below, we find the trial court did abuse its discretion in several respects, and that these errors were not harmless.

---

[1]  The record only reflects Meeks's counsel's oral motion to dismiss the sexual battery claim as to Fajardo, while reserving Meeks's "appellate rights as to AutoZone." The parties and the court seem to have been operating on the mistaken belief that AutoZone had previously been granted summary adjudication on the sexual battery claim.  The jury was not instructed on sexual battery, or asked to return a verdict on such a claim with respect to any party, and Meeks has asserted no claims of error with respect to her sexual battery claim on appeal.  The sexual battery claim therefore has been forfeited, to the extent it was not voluntarily dismissed.

5

*1. Standard of Review.*

"Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) The trial court's "discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

*2. Exclusion of Detailed Testimony Regarding Text Messages.*

a. Additional background.

Meeks contends that she received various inappropriate text messages from Fajardo, including "a pornographic video of a woman on her knees performing *fellatio* on a man and gagging on his penis, inappropriate photographs of himself, and animated images of couples in sexual positions with a message that 'we should try this.'" She could not produce these texts during discovery, however, because she no longer had them in her possession and her efforts to recover them were unsuccessful. Fajardo, too, had not preserved the text messages he sent to Meeks.

During discovery, AutoZone requested evidentiary sanctions "to bar Meeks from pursuing any claims that are based in any manner on the purported text messages that she improperly failed to preserve." The trial court (Commissioner Paulette Durand-Barkley) rejected AutoZone's argument that Meeks had engaged in spoliation, but agreed that "documents not produced and not subject to a protective order should have been produced." The trial court granted "evidentiary sanctions to the extent evidence exists in

6

the form of retrieved text messages and or photos," but stayed its order for 60 days, remarking that "[s]hould documents be produced, or review granted, the matter will become moot."

Prior to trial, AutoZone's motions in limine included a motion to exclude all evidence of, or reference to, text messages and photos allegedly sent by Fajardo. AutoZone proposed that this limitation was appropriate on three alternative bases: (1) the previous order regarding "evidentiary sanctions" issued by Commissioner Durand-Barkley during discovery; (2) the secondary evidence rule; or (3) the hearsay rule. The trial court (Judge Ronald L. Taylor) granted the motion in part, ruling as follows: "Ms. Meeks cannot be asked questions about the specific contents of a text message. However . . . she can testify as to the impact the text messages had on her, she can testify that they were sexual in nature, and she can testify as to other aspects of the text messages that she recalls. However . . . she cannot testify word-for-word about what was in a text message." The trial court further ruled that Fajardo could be asked questions "about text messages that he's already admitted that he sent, or the contents of those, if he recollects those." The trial court based its ruling on the secondary evidence rule, finding that a "genuine dispute exists concerning material terms of the writing and justice requires the exclusion," and "[a]dmission of the secondary evidence would be unfair," in the meaning of Evidence Code section 1521, subdivisions (a)(1) and (2).

Trial was continued, however, and reset before a new judge (Judge Marquez), who required the parties to refile their pretrial motions. After argument by the parties, the trial

7

court expressed its intention to "essentially affirm" Judge Taylor's previous ruling regarding Fajardo's text messages, emphasizing that there was "no reason to reconsider" that previous ruling, because "[t]here's nothing new that has transpired." Judge Marquez specified that "general inquiries about texts, digital photographs, and e-mails between plaintiff and Defendant Fajardo are admissible, limited to general statements that these items were . . . of a sexual nature, offensive, sexually suggestive, and can include general approximations as to when they were received . . . although specific dates would not be permitted. [¶] And no specifics in terms of the numbers, the specific language, the specific depictions, specific dates and times received. . . . It would have to be general in terms of how they were referred to, and the emotional effect that it had on plaintiff, as well as if there were any responses from the plaintiff to the defendant. [¶] . . . [S]o there would be, again, no inquiries that are specific in terms of what did you say, what did he say, going back and forth, or specific descriptions as to what the photos contained."

At trial, Fajardo conceded that he had sent "sexual" text messages to Meeks, among others, though he insisted that "[i]t was coming from her end as well." He characterized his texts to Meeks as "just family stuff" or "[c]hain text . . . [j]okes" that he would send to "a group of people, including my wife, including personal friends, and people I assume were my friends." In a similar vein, the jury also heard that Fajardo had been admonished by AutoZone (specifically, by Ledesma, the district manager to whom Meeks had first complained about Fajardo's conduct) "'not to be texting his employees and not to be sending any silly stuff. It was inappropriate, and that was that.'"

8

Consistent with the limitations imposed by the trial court, Meeks testified at trial that she received "a few sexual text messages from Mr. Fajardo," and elaborated that "[m]ost were extremely offensive, and he [Fajardo] would have a comment on a couple of them." She expressed that when she would receive such texts, she "would be bothered . . . frustrated, upset that [she would] have to deal with this all the time."

### b. Analysis.

Evidence Code[2] section 1521 provides, in part: "The content of a writing may be proved by otherwise admissible secondary evidence." (§ 1521, subd. (a).) "Once the proponent of the evidence establishes its authenticity, section 1521 requires exclusion of secondary evidence only if the court determines (1) '[a] genuine dispute exists concerning material terms of the writing and justice requires the exclusion' or (2) '[a]dmission of the secondary evidence would be unfair.'" (*People v. Skiles* (2011) 51 Cal.4th 1178, 1188 [quoting § 1521, subds. (a)(1) & (2).) Oral testimony may be admissible to prove the content of a writing if certain conditions are met, including, as relevant here, "the proponent does not have possession or control of a copy of the writing and the original is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence" (§ 1523, subd. (b)) and "[n]either the writing nor a copy of the writing was reasonably procurable by the proponent by use of the court's process or by other available means." (§ 1523, subd. (c)(1).)

---

[2] Subsequent undesignated section references are to the Evidence Code.

First, there has been no challenge to Meeks's contentions that she does not have possession or control of the original or a copy of the texts and that they were not reasonably procurable through the court's process or other available means. (See § 1523, subds. (b) & (c)(1).) Additionally, the trial court rejected AutoZone's claim of spoliation, and made no finding that Meeks acted with fraudulent intent when she failed to preserve the texts. Section 1523 therefore does not bar the admission of Meeks's oral testimony regarding the texts.

Second, the findings by the trial court (Judge Taylor) that justice required the exclusion of certain aspects of Meeks's proposed testimony regarding her recollections of the texts she received from Fajardo, and that the admission of such testimony would be unfair, rest on a foundation that is shaky, at best. The trial court expressed that it was "trying to avoid . . . pure speculation about what's in the text messages, because we don't have them before us . . . ." This reasoning vitiates the rule stated in section 1523, specifically allowing oral testimony regarding the contents of an unavailable writing where certain conditions are met. It is not apparent, moreover, why Meeks's specific recollections about the contents of Fajardo's text messages should be equated with "pure speculation." Her memories of electronic communications from Fajardo are no more speculation than her memories of things Fajardo said to her, or his physical actions towards her. The trial court apparently assumed that Meeks could not remember the exact wording of the text messages. This is a questionable assumption, but even if presumed true, it would be no bar to the admission of Meeks's testimony, if she

10

remembered their substance. (See *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1069 ["the law does not require the contents of [lost documents proved by secondary evidence] be proved verbatim"].)

Third, although purporting to "essentially affirm" the ruling of Judge Taylor, Judge Marquez substantially expanded the scope of the limitations on Meeks's testimony, but without any analysis of the effect of such an expansion on the balance of the equities. Judge Taylor would have precluded Meeks from testifying "word-for-word about what was in a text message," but would have permitted her to testify "as to the impact the text messages had on her . . . that they were sexual in nature, and . . . as to other aspects of the text messages that she recalls." Thus, Judge Taylor apparently would have allowed Meeks to describe the pictures and videos that Fajardo sent to her as "other aspects" of the messages, because his fairness concerns were focused on any testimony she might give regarding "the actual texts of these messages."

Judge Marquez, in contrast, prohibited any specific inquiry, not only regarding the text of the messages, but also regarding any "photos" (or other forms of visual media) that were attached to the messages. But this expansion of the limitations on Meeks's testimony was not based on a new analysis of the factors identified in section 1521. Rather, Judge Marquez relied on the mistaken proposition that Judge Taylor had already performed the relevant analysis, and there was "no reason to reconsider" that previous ruling, because "[t]here's nothing new that has transpired." In effect, therefore, Judge Marquez excluded Meeks's proposed detailed testimony regarding the photographs and

11

videos attached to Fajardo's text messages without any judicial officer ever having specifically considered whether justice required those broader restrictions, or whether admission of the proposed evidence would be unfair. (See § 1521, subds. (a)(1) & (2).)

AutoZone and Fajardo insist that admitting Meeks's testimony would have been unfair, and justice required its exclusion, because they would have had "no ability whatsoever to challenge the accuracy or veracity of [Meeks's] testimony on the subject through impeachment or otherwise." We disagree. Nothing prevented Fajardo from presenting his own detailed oral testimony regarding what he sent to Meeks, disputing her characterizations of the messages and any attachments, and challenging her memory during cross examination. It is hardly unusual for trials of sexual harassment claims (and indeed many other types of cases) to involve such he said/she said contests. In such circumstances, the trier of fact—in this case, the jury—is generally entrusted with judging the credibility of each witness and assigning the evidence the appropriate weight. (E.g. *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].)

In the alternative, Fajardo and AutoZone propose that Meeks's proposed testimony regarding texts and attached photographs or videos "would constitute inadmissible hearsay." Not so. "'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200.) "'If a fact in controversy is whether certain words were spoken or written and not whether the words were true, evidence that these

12

words were spoken or written is admissible as nonhearsay evidence.'" (*People v. Fields* (1998) 61 Cal.App.4th 1063, 1068-1069.) Here, Fajardo's messages to Meeks obviously constitute "out of court statement[s]," within the meaning of the hearsay rule. But Meeks's proposed testimony regarding those out of court statements was not offered to prove the truth of the matters stated. For example, as Meeks points out in her briefing on appeal, testimony that Fajardo sent Meeks a picture of two individuals in a sexual position, accompanied by the text "'we should try this,'" is not offered for the truth of the matters asserted, that is, either that the two individuals depicted did in fact have sex, or that Meeks and Fajardo should "try" it. Rather, such testimony is offered to prove that Fajardo sent Meeks a message that was both objectively and subjectively offensive, to establish one of the elements of Meeks's claim of harassment. (See *Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1226 [discussing elements of harassment claim].) Evidence of such "'operative facts'" does not constitute hearsay. (*People v. Smith* (2009) 179 Cal.App.4th 986, 1003; see *ibid.*, quoting 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 31, p. 714 ["where "'the very fact in controversy is whether certain things were said or done . . . the words or acts are admissible not as hearsay[,] but as original evidence"'"].)

We conclude that the limitations on Meeks's testimony regarding Fajardo's text messages to her—both in the narrower form originally placed by Judge Taylor, and as eventually implemented in an expanded form at trial by Judge Marquez—were erroneous.

13

We will return to the issue of prejudice after first considering Meeks's other claims of error with respect to the trial court's evidentiary rulings.

### 3. Exclusion of Testimony Regarding Meeks's Knowledge of the Termination of Another Employee Who Had Reported Harassment.

#### a. Additional background.

AutoZone's motions in limine included a motion to exclude any testimony regarding "instances of alleged harassment of and retaliation against Alaxandreia Olson Shelton, a former employee of AutoZone."[3]  AutoZone represented that "Ms. Olson was employed by AutoZone as a Customer Service Representative and a Parts Sales Manager from around September 2005 until July 2006."  In July 2007, Olson brought suit against AutoZone, claiming retaliation for having reported harassment by her store manager, Robert Lopez.  The lawsuit was resolved by means of a confidential settlement. AutoZone contended that evidence regarding Olson's allegations and prior lawsuit should be excluded, on several grounds.

In opposing AutoZone's motion, Meeks argued that Olson's circumstances were not unrelated to her own, pointing out that Lopez had been Meeks's own first store manager, and that the AutoZone human resources manager and district supervisor who had investigated Olson's claims against Lopez were also involved in the investigation of Meeks's claims against Fajardo.  Although Meeks's knowledge of Olson's circumstances

---

[3]  The parties have generally referred to this individual by the last name "Olson," which is apparently her maiden name and her name at the time she was an AutoZone employee.  To avoid confusion, we will do the same.

14

was entirely secondhand, she "was aware that her own former Store Manager . . . sexually harassed [Olson], that Olson reported it, and that . . . [Meeks's] own District Supervisor at the time [had] terminated Olson."

The trial court granted AutoZone's motion, excluding any specific evidence of Olson's circumstances. The trial court did permit Meeks to testify generally regarding her state of mind, "that based on what she heard, whether it's rumors or what she heard, she feared that she could be fired if she made a complaint." Consistent with this limitation, Meeks testified that when Fajardo told her it would be in her "best interests not to report the situation," she "believed him based off of something I had learned when I was previously—previously hired. Within my first year, I had learned of something that had happened, and I made my own conclusion from that."

### b. Analysis.

Section 352 allows the trial court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The scope of the trial court's discretion in determining whether to exclude otherwise relevant evidence pursuant to section 352 is "broad," and reviewed for abuse of discretion. (*People v. Clark* (2011) 52 Cal.4th 856, 893.)

Evidence regarding Olson's circumstances was relevant in some respects to Meeks's claims regarding Fajardo, even though Olson was allegedly harassed by Lopez,

15

and not Fajardo.  One of the themes of the defense in this matter was that the jury should not believe Meeks's account of Fajardo's actions and her reactions thereto because she failed to report the alleged harassment to AutoZone for an extended period of time. Meeks's proposed evidence regarding Olson, and AutoZone's response to her complaint against Lopez, at least arguably tended to show that Meeks reasonably feared retaliation if she were to report Fajardo's inappropriate behavior.  Evidence of the harassment Olson allegedly suffered also would tend to support Meeks's argument that there was a "climate of bias" and a "general attitude of disrespect toward his female employees" within AutoZone, and no effective means for redress for harassment through internal reporting. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 112-113 (*Pantoja*).)

Nevertheless, it was not beyond the bounds of reason for the trial court to conclude that the probative value of detailed testimony regarding Olson's alleged circumstances and Meeks's knowledge thereof was substantially outweighed by the probability that its admission would necessitate an undue consumption of time and risk confusing the issues.  There is no indication in the record that Meeks had personal knowledge of Lopez's alleged harassment of Olson; rather, a "cousin of Meeks who worked with Olson told Meeks that she had witnessed these events and shared that she too had been sexually harassed by Lopez."  There was a substantial danger, therefore, that introducing specific evidence of Meeks's knowledge of Olson's circumstances would have led to a trial within a trial, not only of Olson's claims of harassment by Lopez and retaliation by AutoZone, but also Meeks's cousin's allegation of harassment by Lopez.

16

Meeks proposes that "[a]ny legitimate concern for undue consumption of time or confusion of issues could have been remedied by allowing Meeks to explain what she saw and heard," introducing evidence of "Olson's contemporaneous dates of employment," and "instructing the jury that no judicial determination was made in Olson's case (her claim was settled out of court)." It is questionable, however, whether such a course of action would have been equitable, since AutoZone and Fajardo would have been left unable to challenge the veracity of what Meeks heard about Lopez's behavior or AutoZone's response to Olson's complaint. Moreover, the circumstance that the trial court arguably could have exercised its discretion differently does not establish that the manner in which it did exercise its discretion falls outside the bounds of reason.

We find no error in the trial court's ruling excluding any specific evidence of Olson's allegations of harassment by Lopez and retaliation by AutoZone pursuant to section 352. We therefore need not, and do not, address the parties' arguments regarding other possible bases for excluding the evidence.

4. *Exclusion of Evidence of Fajardo's Conduct Towards Other AutoZone Employees.*

a. Additional background.

Prior to trial, AutoZone sought an order excluding from trial any evidence of, or reference to, "alleged sexual harassment of other AutoZone employees" by Fajardo. The trial court granted the motion, finding that evidence of misconduct by Fajardo with respect to other AutoZone employees was not admissible pursuant to section 1101,

17

subdivisions (a) and (b).  The trial court expressed willingness to reconsider, however, if other evidence at trial "open[ed] the door."  Specifically, the trial court contemplated that if Fajardo were to testify that "he had a relationship with other employees where there was a banter that went back and forth, and it was—everyone agreed on it, and it was consensual by all parties, then, of course, that opens the door."

At trial, on his first day of testimony, Fajardo testified that he would give "compliments" to female employees, including Meeks, by calling them "beautiful" and "gorgeous," reasoning that "a simple compliment could turn the whole day around."  He denied any "bad intent," insisting that he just wanted to get his team "motivated."  And he testified that he gave compliments not just to female employees, stating:  "I didn't restrict myself to just the female employees.  I did it to the males too.  [¶]  Like, 'Damn, Dude, you look good today.  Going out today?  What's going on?'"  He denied looking female employees "up and down" when he delivered compliments. He admitted exchanging sexual jokes with Meeks and other AutoZone employees.  He also admitted that he had sent "sexual" text messages to Meeks, among others.  He characterized these texts to Meeks as "just family stuff," or "[c]hain text . . . [j]okes" that he would send to "a group of people, including my wife, including personal friends, and people I assume were my friends."  He felt that the sexual text messages were "consensual" because "[i]t was a two-way street.  It wasn't just coming from my end."  Fajardo denied that anyone had ever complained that they found his messages offensive.  He did admit sending a "sexual

18

text message" to someone "by mistake," but the trial court did not permit any further inquiry on the topic.

After Fajardo's first day of testifying, the trial court instructed the jury to disregard any of his testimony "unless it pertained to the plaintiff, Ms. Meeks.  [¶]  So that if Ms. Meeks . . . was present during those conversations . . . or present at one of the stores when the conduct occurred, then you would consider that evidence.  Otherwise, you should disregard any other conduct that was discussed to which Ms. Meeks was not a party . . . ."

Subsequently, Fajardo testified that he had treated Meeks with the same degree of familiarity as he did other AutoZone employees, including by giving her a hug or a cheek-to-cheek "kiss" in greeting.  He claimed that this sort of familiarity was not limited to women, but rather was part of the "family" atmosphere of the store:  "Like I said, we were kind of like a family.  We were—guys, we did the bro hug.  'Hey, bro, how are you doing?'  [¶]  You know, so it wasn't just directly to Ms. Meeks."  Under questioning by his own attorney, he denied ever calling anyone, including Meeks, "sweet cheeks," or whistling at them.

Fajardo also subsequently elaborated with respect to the sexual text message he had previously admitted sending by mistake.  He stated that he had "by accident" sent a single text with sexual content to Kayla Elliott, an employee in the store that he managed, in 2010.  The trial court instructed the jury, however, that the evidence regarding Elliott should not be considered with respect to the claims against Fajardo individually, but only

19

with respect to "AutoZone and the liability that AutoZone could suffer for notice and failure to prevent."

Meeks argued that Fajardo's testimony had opened the door to inquiry into and evidence of his conduct with respect to other AutoZone employees. She proposed to present testimony from four other female AutoZone employees who had allegedly experienced harassment by Fajardo. Several were offered not only to testify in general about the inappropriate behavior they experienced, but to dispute specific aspects of Fajardo's testimony. Elliot, for example, would have testified that she received text messages with sexual content from Fajardo not just on a single occasion, as he had asserted, but three separate times. The testimony of Ariane Deanda and Amanda Anguiano was offered to impeach Fajardo's testimony that no one had ever expressed to him that they were offended by the sexual text messages he sent, or told him to stop sending them. Heather Carbine would have disputed Fajardo's denial of looking female employees "up and down." According to her, among other inappropriate conduct, Fajardo "looked her up and down while saying, in response to a request for an item, 'What are you going to do for it?' in a suggestive manner."

Three of the four women informed their supervisors of at least some of Fajardo's alleged conduct. After Fajardo was transferred to a different store, Carbine told her new store manager, Rachel Montanez, of Fajardo's behavior. Deanda and Elliot told their assistant manager, Vicente Martinez, who was himself prepared to testify about inappropriate behavior by Fajardo that he personally observed, as well as retaliation by

20

Fajardo that he suffered after he passed Elliot's complaint on to a district manager, Ledesma, and Staci Saucier, a "Regional HR Manager."

For the most part, the trial court did not allow Meeks's proffered evidence of Fajardo's conduct towards other AutoZone employees to be presented to the jury. Carbine, Martinez, Deanda, and Elliot were not permitted to testify, though some evidence of Elliot's complaint was admitted through the testimony of Ledesma and Fajardo. The jury was instructed, however, that evidence regarding Elliot should not be considered with respect to Meeks's claims against Fajardo individually, but only with respect to the issue of "the notice that was given to . . . AutoZone and the liability that AutoZone could suffer for notice and failure to prevent." Anguiano testified at trial, but in a circumscribed manner. She was allowed to testify in general terms (see *ante*, section III(A)(2)) regarding a text message with sexual content from Fajardo that both she and Meeks received, which she saw on Meeks's phone, as well as what she observed of Meeks's reaction to it. She also testified, again in general terms, regarding several other text messages that Fajardo had admitted to sending her. She testified about inappropriate conduct by Fajardo toward Meeks that she had observed. And she was permitted to describe one occasion when Fajardo said something inappropriate to her—calling her "sugar lips"—when Meeks was present. But Anguiano was not permitted to describe any of Fajardo's behavior toward her outside of Meeks's presence, which, according to her deposition testimony, was often inappropriate.

21

b. Analysis.

California courts have held so-called "me too" evidence, that is, evidence of gender bias against employees other than the plaintiff, may be admissible evidence in discrimination and harassment cases. (See *Pantoja*, *supra*, 198 Cal.App.4th 87; *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740 (*Johnson*).) The relevance of evidence concerning conduct toward nonparty employees is inherently "'fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" (*Johnson*, *supra*, at p. 767.) "[S]imilar considerations are involved in balancing the probative value of the evidence against its prejudicial effect." (*Ibid.*) "Me too" evidence is therefore not subject to any per se rule of exclusion, and may be admissible to prove a defendant's motive or intent even where the conduct occurred outside the plaintiff's presence and at times other than when the plaintiff was employed. (*Pantoja*, *supra*, at pp. 115-116; see also *Sprint/United Mgmt. Co. v. Mendelsohn* (2008) 552 U.S. 379, 381, 388 [evidence that employer discriminated against employees other than plaintiff "is neither *per se* admissible nor *per se* inadmissible," and instead "requires a fact-intensive, context-specific inquiry"].)

In *Johnson*, for example, the plaintiff alleged that she was terminated because she was pregnant. (*Johnson*, *supra*, 173 Cal.App.4th at p. 744). In opposition to the defendant's motion for summary judgment, the plaintiff submitted declarations from three employees who stated that they worked at the same facility, had the same

supervisors, and were fired after it was revealed they were pregnant. (*Id.* at p. 761.) The Court of Appeal held the declarations were admissible, and sufficient to raise a triable issue of material fact regarding the reason for the plaintiff's termination, because they presented factual scenarios similar to the one presented by the plaintiff, and their probative value "clearly outweigh[ed] any prejudice that would be suffered by defendant" by their admission. (*Id.* at p. 767.)

Similarly, in *Pantoja*, *supra*, 198 Cal.App.4th 87, the Court of Appeal held that the jury should have been allowed to hear "me too" evidence concerning harassing activity against female employees other than the plaintiff. (*Id.* at p. 92.) The plaintiff alleged her employer had touched her buttocks, verbally abused her with gendered derogatory epithets, and terminated her. (*Id.* at p. 93.) At trial, the plaintiff sought to introduce evidence the defendant had also verbally abused and inappropriately touched other female employees. (*Id.* at p. 97.) The Court of Appeal found this evidence was relevant and admissible to prove the employer's intent, to impeach the employer's credibility as a witness, and to rebut factual claims made by defense witnesses. (*Id.* at pp. 109-110.) It also rejected the exclusion of the evidence pursuant to section 352, finding that its probative value was "unquestionable," and that any risk the evidence would have been used improperly "as evidence of a propensity to act in the manner described" could have been mitigated sufficiently with a limiting instruction. (*Pantoja*, *supra*, at p. 118.)

Under *Pantoja* and *Johnson*, and similar authority, the trial court was incorrect to conclude, as it apparently did, that evidence of Fajardo's behavior outside of Meeks's

23

presence was inadmissible with respect to her claims against him. The trial court's rulings, instructing the jury to disregard evidence of Fajardo's behavior unless Meeks was "party" to the interaction, to consider me-too evidence only with respect to Meeks's claims against AutoZone, and excluding the bulk of her proffered me-too evidence, reflect a misunderstanding of the law. This misunderstanding necessarily informed not only the trial court's threshold determinations of admissibility, but also its evaluation of the probative value of Meeks's proffered evidence for the purpose of making discretionary decisions regarding admission of evidence pursuant to section 352. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 ["'[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue'"].)

Defendants argue that "unlike the individual defendant in *Pantoja*, Fajardo did not place his intent in issue by his defense at trial." Not so. As noted in *Pantoja*, a plaintiff must prove discriminatory intent or bias not only in discriminatory hiring or firing claims, but also hostile environment harassment claims: "Sex discrimination [in the form of discriminatory hiring or firing] and sexual harassment are 'distinct causes of action' under the FEHA [citation], but a hostile environment, to be actionable, still must constitute a form of ""*discrimina[tion]* . . . because of . . . sex,"" [citation] . . . . There is no reason why me-too evidence would be admissible under section 1101, subdivision (b), to prove the defendant's discriminatory mental state in one type of case but not the other." (*Pantoja*, *supra*, 198 Cal.App.4th at pp. 115-116.) Fajardo specifically disputed

24

that his behavior was motivated by discrimination because of sex, repeatedly insisting that he treated male and female employees similarly. Meeks was entitled to prove otherwise, including through me-too evidence.

For present purposes, we need not and do not opine whether each item of me-too evidence proffered by Meeks should have been admitted, or whether some could reasonably have been excluded pursuant to section 352 even applying an appropriate analysis of its probative value. It is enough to conclude that the analysis of probative value apparently applied by the trial court was erroneous, and therefore constituted an abuse of discretion.

*5. Evidence Regarding Meeks's Tattoo and Alleged Conversations with Fajardo Regarding Sexual Conduct.*

a. Additional background.

Over objections, the trial court permitted Fajardo to testify with some specificity that Meeks had "shared intimate stuff about her life" with him. The first example he gave was that on one occasion, she came to work with a black eye, and had laughed about it—the jury heard that it was in relation to a "bar fight," but did not hear that it was a bar fight with an ex-boyfriend. Other personal conversations that Fajardo testified Meeks had with him at work included a discussion about a tongue piercing that Meeks purportedly wore, during which she stated that she "liked oral" and "licked her lip . . . with the piercing going back and forth." Fajardo also testified that she told him about a trip to Las Vegas with a then-boyfriend, during which "everyone else got drunk . . . and

25

she ended up having to babysit all of them." At some point while she was "babysit[ting]" her drunken companions, "she ended up getting peed on by her boyfriend." Fajardo also testified that later, once Meeks was already married, she discussed the age difference between her husband and herself, stating among other things that "if he couldn't keep up, as in the sexual drive, I'm assuming," she "will find it somewhere else."

Fajardo further testified that in 2009 or 2010, Meeks described to him a tattoo that she "plan[ned] on getting" on her lower abdomen, below her belly button. According to Fajardo, she "explained that the tattoo was going to be a heart with some other design," and indicated the location with her hands. Fajardo testified that he said that seemed like it was "going to be painful," and she responded "'No, I don't think so.'" She then asked "'Don't you want to know how low it goes?'" He "responded with 'Well, knowing you, I could only imagine.'"

Meeks testified that she had "friendly conversations" with Fajardo, but "nothing that went too personal." She denied having shared anything with Fajardo about her "sexual preferences" or her sexual relationship with her husband. According to her, she may have mentioned that she went on a trip, but did not believe that she described for him "anything personal, other than that I had went somewhere." With respect to her tattoo, Meeks testified that she had a discussion about her tattoo in Fajardo's presence, during which she stated that she had a tattoo of a heart with wings on her abdomen below her belly button that "went from hip to hip." She denied that she ever "physically showed" the tattoo to anyone at AutoZone other than her husband, and denied that she

26

ever shared any detail with Fajardo about "how far it went." During cross-examination, the defense was permitted to publish to the jury a photograph of Meeks's tattoo, which she had posted to a social media account. She noted, however, that the post was uploaded in 2006. She denied ever having a discussion with Fajardo about a planned tattoo in 2009, as he had testified; she had already had the tattoo at issue for at least three years by that time.

b. Analysis.

Sexual harassment is actionable under FEHA when there is "a pattern of continuous, pervasive harassment," giving rise to a hostile work environment that is both objectively and subjectively offensive. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 607-608, 611.) In contending that the "subjectively offensive" element was not proven, a defendant "will assert that a plaintiff consented to the conduct through active participation in it, or was not injured because the plaintiff did not subjectively find it abusive." (*Rieger v. Arnold* (2002) 104 Cal.App.4th 451, 461 (*Rieger*).)

Section 1106 limits the evidence the defendant may use to support this assertion. It provides that "[i]n any civil action alleging conduct which constitutes sexual harassment, sexual assault, or sexual battery, opinion evidence, reputation evidence, and evidence of specific instances of the plaintiff's sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the plaintiff or the absence of injury to the plaintiff . . . ." (§ 1106, subd. (a).) This general rule is, however, subject

27

to the exception that it "does not apply to evidence of the plaintiff's sexual conduct with the alleged perpetrator." (§ 1106, subd. (b).) The term "sexual conduct" within the meaning of section 1106 has been broadly construed to include "all active or passive behavior (whether statements or actions) that either directly or through reasonable inference establishes a plaintiff's willingness to engage in sexual activity," including "racy banter, sexual horseplay, and statements concerning prior, proposed, or planned sexual exploits." (*Rieger*, *supra*, 104 Cal.App.4th at p. 462.)

Applying these principles to the present case, evidence that Meeks discussed personal and intimate matters with Fajardo, particularly in a sexually explicit manner, is relevant as tending to show, to some extent, that she was not offended by Fajardo's alleged inappropriate behavior. The circumstance that Meeks denies having engaged in any such conversations with Fajardo, and that he produced no independent witnesses corroborating his testimony to the contrary, demonstrates only a factual dispute between the parties for the jury to decide, not that his testimony should have been excluded. And Meeks's point that engaging in such conversations does not equate to consent to physical groping, overt sexual advances, or the sending of sexually explicit texts, is well taken. Nevertheless, it was not beyond the bounds of reason for the trial court to conclude that Fajardo's testimony regarding his discussions with Meeks was relevant, even if not conclusive, evidence in support of his defense, and not so inherently prejudicial or inflammatory as to require its exclusion.

28

Meeks argues that evidence of her conversations with Fajardo should have been excluded on procedural grounds, specifically, the failure of the defense to make a noticed motion pursuant to section 783. Section 783 provides procedures to be used when evidence of a plaintiff's sexual conduct is used to attack the plaintiff's credibility in civil actions. (§ 783.) Here, however, the evidence of Meeks's sexual conduct was not admitted to attack her credibility, but rather in support of the argument that Meeks either consented to, or was not injured by, Fajardo's behavior, pursuant to section 1106, subdivision (b). Meeks's reliance on section 783 is therefore misplaced.

A different analysis applies, however, to the trial court's decision to permit the defense to publish the photograph of Meeks's tattoo to the jury. It is doubtful that getting or having a tattoo, in and of itself, constitutes "sexual conduct" in the meaning of section 1106, as a general matter. Nevertheless, given the location of the particular tattoo at issue, the act of taking and sharing a photograph of it likely falls within the broad scope of the term. (*Rieger*, *supra*, 104 Cal.App.4th at p. 462.) But neither the photograph itself, nor Meeks's 2006 decision to publish it to social media, was "conduct with" Fajardo in any respect, so as to fall within section 1106, subdivision (b). As such, the general exclusion provided by section 1106, subdivision (a), applies to the photograph at issue. Additionally, although Meeks disputes Fajardo's testimony about their purported discussion about the tattoo, she has never denied that she had the tattoo, or disputed Fajardo's description of it. The notion, apparently accepted by the trial court, that the photograph is relevant to impeach some aspect of Meeks's testimony, is therefore not

29

supported by the record. If anything, evidence that the tattoo was already on Meeks's body in 2006 contradicts *Fajardo's* testimony that he and Meeks had, in 2009 or 2010, discussed the tattoo as something she was planning on getting.

We find that the trial court abused its discretion by permitting the defense to publish the photograph of Meeks's tattoo to the jury, and should have instead excluded it from evidence pursuant to section 1106, subdivision (a). Meeks's arguments to the contrary notwithstanding, admission of Fajardo's testimony regarding his conversations with Meeks did not exceed the scope of the trial court's discretion.

### 6. *Exclusion of AutoZone Investigation Documents.*

#### a. Additional background.

Prior to trial, AutoZone sought an order excluding from evidence certain documents it referred to as "Q and A Statements," which Meeks has referred to as an "investigation report." The documents at issue consist of a number of unsworn witness statements dating from August and September 2010, which were taken by AutoZone as part of its investigation that led to Fajardo's September 2010 termination.

The trial court granted AutoZone's motion, finding the documents to be hearsay, permissible for use at trial "for impeachment or rehabilitation only."

During trial, Meeks again sought admission of the documents into evidence. The trial court denied Meeks's request, again citing to the hearsay rule, and additionally finding that, even if the documents were relevant and admissible, they should be excluded pursuant to section 352 because their admission would necessitate undue

30

consumption of time, and would confuse the issues. With respect to section 352 issues, the trial court noted that the documents raised "all kinds of different inquiries," including many that were not relevant to the present case. The documents referenced, according to the trial court's count, "37 individuals that were in some way involved," including "quite a few, many of whom did not testify in this trial." The trial court expressed its concern that "it would be another mini trial looking at all the different statements that were made," and attempting to redact the statements would cause confusion, and undue consumption of time.

### b. Analysis.

Meeks argues that the trial court erred by concluding that the investigation reports were inadmissible, relying primarily on *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256. She does not attempt, however, to demonstrate that the trial court's alternative ruling, excluding the documents pursuant to section 352, amounted to an abuse of discretion. """"When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.""""" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) Furthermore, although we decline to discuss the matter at length, we conclude from our review of the record that the trial court's determination—that admission of the statements would necessitate undue consumption of time, and would likely confuse the issues—did not exceed the bounds of reason. Even if the issue were not waived, therefore, we would find no error in the trial court exclusion of these documents from evidence pursuant to

31

section 352. We express no opinion about whether the trial court could have exercised its discretion differently, for example, by admitting a limited or redacted portion of the statements.

### 7. The Trial Court's Errors Were Not Harmless.

As discussed above, the trial court's evidentiary rulings were erroneous in several respects. Specifically, we found abuses of the trial court's discretion with respect to Meeks's proposed testimony about Fajardo's text messages to her, the proffered me-too evidence of misconduct by Fajardo against other AutoZone employees, and the publication of the photograph of Meeks's tattoo to the jury. We turn now to the question of whether these errors were prejudicial and require reversal of the judgment. We conclude that they do.

"Claims of evidentiary error under California law are reviewed for prejudice applying the 'miscarriage of justice' or 'reasonably probable' harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, that is embodied in article VI, section 13 of the California Constitution. Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred." (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447.)

We are persuaded that it is reasonably probable Meeks would have received a more favorable result at trial, if the errors discussed above had not occurred. Among other things, to prevail, Meeks had the burden of showing that the harassment she

allegedly suffered was not only subjectively offensive, but also objectively offensive; that is, not only did she perceive the workplace as hostile or abusive, but also a reasonable person would "“"“share the same perception.”"”" (*Fuentes v. AutoZone, Inc.*, *supra*, 200 Cal.App.4th at p. 1226.) Because Meeks was prohibited from telling the jury the details she recalled of the contents of the texts she received from Fajardo, the jury had no basis to evaluate whether a reasonable person would share her view that they were offensive, or whether Fajardo was correct that it was all just "family stuff" and "[c]hain text . . . [j]okes" that would not offend a reasonable person. Similarly, the exclusion of Meeks's proffered me-too evidence undermined one of her strongest attacks on Fajardo's assertions that his behavior was not discriminatory harassment, but rather part of a managerial strategy for boosting the morale of all employees, male and female, with cheery greetings.

Moreover, we note that here, as in *Pantoja*, the trial court's erroneous evidentiary rulings had "the unfortunate result of skewing the evidence." (*Pantoja*, *supra*, 198 Cal.App.4th at p. 120.) Fajardo was permitted to testify in some detail regarding statements relating to sex and other intimate matters purportedly made by Meeks; she was forbidden to testify except in sanitized terms about the statements and images with sexual content that Fajardo sent to her, and effectively precluded from challenging his testimony regarding that content. Meeks was precluded from showing the jury much of her evidence of Fajardo's behavior with respect to other AutoZone employees, because it took place outside of her presence; Fajardo was permitted to publish to the jury a

33

revealing photograph of Meeks's body that was of minimal, if any, relevance to the matters at hand, even though the photograph was taken years before Meeks and Fajardo met, and even though there is nothing in the record establishing that Meeks intentionally shared it with Fajardo.  Here, as in *Pantoja*, the trial was essentially a "credibility contest," and the trial court's errors cumulatively may well have unfairly "tipped the balance" in favor of the defense.  (*Pantoja*, *supra*, at p. 119.)

Because it is reasonably probable that Meeks would have obtained a more favorable result at trial absent the trial court's erroneous evidentiary rulings, the judgment must be reversed and the matter remanded for a new trial.

**B.  The Trial Court Properly Granted Summary Adjudication in Favor of AutoZone on Meeks's Retaliation Claim.**

Meeks contends that the trial court (Judge Edward D. Webster) erred by granting summary adjudication in favor of AutoZone on her retaliation cause of action.  Based on our independent review of the record, we find no error.

*1.  Standard of Review.*

"On appeal from a ruling on a motion for summary judgment or adjudication, the appellate court conducts its own independent review of the moving and opposition papers and applies the same standard as the trial court in determining whether the motion was properly granted.  The appellate court is not bound by the trial court's stated reasons for its ruling on the motion, as the appellate court reviews only the ruling and not its rationale."  (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 457.)  "Although our review of a

34

summary judgment [or adjudication] is de novo, it is limited to issues which have been adequately raised and supported in plaintiff['s] brief. [Citations.] Issues not raised in an appellant's brief are deemed waived or abandoned. [Citation.]" (*Id.* at p. 466, fn. 6.)

2. *Analysis.*

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) "An '"adverse employment action"' . . . requires a 'substantial adverse change in the terms and conditions of the plaintiff's employment.'" (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1063.) The term "adverse employment acts" encompasses not only "'ultimate' employment actions, such as hiring, firing, demotion or failure to promote," but also "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for career advancement." (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1380-1381.) Nevertheless, "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable . . . ." (*Yanowitz, supra*, at p. 1054.)

35

There is no evidence in the record that AutoZone subjected Meeks to an adverse employment action after she reported Fajardo's alleged harassment. When she testified at trial in May 2014, she continued to be employed by AutoZone in the role of store manager. She "never experienced a loss or reduction in her classification, position, salary, benefits and work hours; and her employment was not terminated." (*Jones v. Department of Corrections & Rehabilitation*, *supra*, 152 Cal.App.4th at p. 1381.) She has not argued that she suffered working conditions so intolerable or aggravated as to constitute constructive discharge, that her performance evaluations suffered, or that she was ever denied any promotion or assignment that might have led to promotion. Meeks testified that Ledesma threatened her with an adverse employment action—to fire her and her husband, if she did not "squash" her complaint about Fajardo—but there is no evidence that the threat was carried out. Meeks has presented no authority, and we are aware of none, holding that a single threat of an adverse employment action, never carried out, could itself constitute an adverse employment action under the standard articulated in *Yanowitz* and its progeny. On these facts, summary judgment in favor of AutoZone on the retaliation claim was appropriate.

## IV. DISPOSITION

The judgment is affirmed in part and reversed in part as follows: The trial court's grant of summary adjudication in favor of AutoZone on Meeks's retaliation claim is affirmed. The judgment in favor of defendants is affirmed with respect to Meeks's sexual battery claim. The judgment is reversed with respect to Meeks's other claims, and

36

the matter is remanded for a new trial and any other necessary proceedings.  Meeks is awarded her costs on appeal.

CERTIFIED FOR PUBLICATION


CODRINGTON
J.

We concur:


RAMIREZ
P. J.

MCKINSTER
J.